**FEE PAID**

FILED

**UNITED STATES DISTRICT COURT**

S/I

**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**    2025 MAY -7 AM 9: 24

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES
BY:    **rsm**

| | |
|---|---|
| DESIREE GUERRIERE TOWNSEND, an individual,<br><br>Plaintiff,<br><br>v.<br><br>PARAMOUNT GLOBAL, a Delaware corporation; CBS BROADCASTING INC., a New York corporation, and INSIDE EDITION INC., a New York Corporation,<br><br>Defendants. | Case No.: **2:25-CV-04077-MRA-DFMx**<br><br>**COMPLAINT FOR:**<br><br>(1)  **DEFAMATION**<br>(2)  **FALSE LIGHT INVASION OF PRIVACY**<br>(3)  **INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**<br>(4)  **VIOLATION OF CALIFORNIA CIVIL CODE §3344**<br>(5)  **VIOLATIONS OF THE CALIFORNIA UNRUH CIVIL RIGHTS ACT (CAL. CIV. CODE § 51)**<br>(6)  **VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT (42 U.S.C. § 12182)**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Desiree Guerriere Townsend ("Townsend") complains of Defendants PARAMOUNT GLOBAL (together with its affiliates and subsidiaries, "Paramount"), CBS BROADCASTING INC. (together with their affiliates and subsidiaries, collectively referred to as "CBS") and INSIDE EDITION INC. (together with their affiliates and subsidiaries, collectively referred to as "Inside Edition"), (Paramount, CBS, and Inside Edition are collectively referred to herein as the "Defendants") and alleges as follows:

## NATURE OF THE ACTION

1.      This is a civil action for defamation, false light invasion of privacy, violation of California Civil Code § 3344, intentional infliction of emotional distress, and disability

1

discrimination under both the California Unruh Civil Rights Act and Title III of the Americans with Disabilities Act.

2.      Plaintiff Desiree Guerriere Townsend brings this action against Defendants Paramount Global, CBS Broadcasting Inc., and Inside Edition Inc. for knowingly producing, airing, and enabling the viral republication of a deceptive broadcast segment that misrepresented her medically diagnosed neurological condition. Defendants' conduct placed Plaintiff in a false light by creating the misleading and offensive implication that she was fabricating her symptoms or suffering from mental instability. This portrayal was not only false and highly offensive to a reasonable person in Plaintiff's position, but it was made with knowledge of its falsity or reckless disregard for the truth. As a result, Plaintiff has suffered widespread reputational harm, severe emotional distress, and economic injury. Despite being given the opportunity to correct the record, Defendants refused, thereby endorsing and amplifying the original false impression and its damaging consequences.

3.      This lawsuit seeks to hold Defendants accountable for weaponizing their media platform to deliberately destroy a woman's life, reputation, and career. Paramount Global, through its subsidiaries, CBS Broadcasting Inc. and Inside Edition Inc., chose mockery over truth, cruelty over ethics, and silence over accountability. For more than fifteen years, Defendants have allowed a defamatory and misleading broadcast to define the public image of Plaintiff Desiree Guerriere Townsend, formerly Desiree Jennings, living with a rare neurological disorder later diagnosed as Stiff Person Syndrome (SPS). Plaintiff became the subject of national ridicule following a deceptive 2010 segment aired by Inside Edition, which mischaracterized her condition and cast her in a false and humiliating light[1]. (*See* **Exhibit A** attached hereto.)

---

[1] See *Inside Edition*, "Flu Shot Woman," available at: https://www.insideedition.com/159-flu-shot-woman (last accessed May 6, 2025).

4.      Upon information and belief, the defamatory segment consisted of a press release, a written article hosted on a dedicated page of Defendants' website, and a video segment that originally aired as part of a television broadcast and was also made available on a dedicated webpage and distributed across Defendants' branded digital platforms. Defendants have since admitted that the video segment has been removed from their platforms. (*See* **Exhibit B** attached hereto.)

5.      What began as a misinformed media hit piece has metastasized into an unrelenting cycle of viral humiliation. In April 2025, the same Inside Edition broadcast that had cast Plaintiff in a false and defamatory light, one that, by CBS's own admission, had been quietly removed from their official platforms, resurfaced across social media, triggering millions of views and an avalanche of renewed online abuse. Defendants were immediately placed on notice and were sent a formal retraction demand pursuant to California Civil Code § 48a. (*See* **Exhibit C** attached hereto).

6.      The Defendants' response to the retraction demand was an outright refusal, not only to retract the false and harmful narrative they created, but to take even the most basic steps to curb its viral spread. More disturbingly, they refused to acknowledge the ongoing and compounding harm inflicted on the Plaintiff, a woman whose only "crime" was suffering from a rare neurological condition that the medical community itself often struggles to diagnose. On average individuals with SPS endure a delay of over six years before receiving a correct diagnosis, often being misdiagnosed with other conditions. The fact that the Defendants would ignore this reality, and knowingly portray a medically vulnerable woman as deceptive or mentally unstable, demonstrates a level of callousness and cruelty unbecoming any journalistic or ethical standard. (*See* **Exhibit D** attached hereto).

7.      This failure was not an isolated oversight—**it is emblematic of a deeper, systemic breakdown in corporate governance at Paramount Global and its media subsidiaries.** At every level, Defendants had the opportunity to intervene: to retract the misleading content, to verify the medical evidence provided, to prevent renewed harm when the segment resurfaced, or at the very least, to acknowledge the consequences of their actions. Instead, Paramount and its affiliates have demonstrated a deliberate pattern of editorial irresponsibility, institutional apathy, and willful disregard for the harm inflicted by their content. Their refusal to act, even when directly presented with evidence of factual inaccuracy and human suffering, reflects not just negligence, but a corporate policy of evasion and denial, shielding profit-driven sensationalism behind a façade of plausible deniability.

8.      In response to Plaintiff's retraction demand, which requested **no monetary compensation**, only the removal or correction of the segment, Defendants callously dismissed the medical records she provided to Inside Edition's production team in 2010, as mere **"talking points," "key facts,"** or **"context"** that *Inside Edition* was under no obligation to report. (*See* **Exhibit C**). That chilling response wasn't just dismissive, it was a confession. This brazen admission reveals a willful disregard for truth, ethics, and basic human decency, and lays bare a **toxic corporate culture at Paramount and its subsidiaries**—one in which editorial negligence is not only tolerated, but actively excused, and the suffering of the vulnerable individuals they target is treated as collateral damage in the pursuit of sensationalism and monetization.

9.      Defendants' conduct went far beyond defamation, it amounted to targeted character assassination that compromised Plaintiff's ability to obtain medical care and live with dignity, effectively denying her the basic civil rights afforded to individuals with disabilities under state and federal law. Under the corporate governance of Paramount Global, a publicly traded media

conglomerate, CBS through Inside Edition knowingly broadcast a distorted portrayal of Plaintiff with a rare neurological disorder, callously manipulating her suffering for profit. This broadcast was not only false, it was weaponized. It shaped public opinion, seeded doubt, and poisoned the judgment of medical professionals who viewed the segment and, as a result, questioned the legitimacy of Plaintiff's symptoms and diagnosis. Paramount's failure to retract the segment, even after being reminded of the verifiable medical records they were presented in 2010, reflects a deeply entrenched corporate culture—one that devalues truth.

10.    This conduct constitutes a direct violation of the California Unruh Civil Rights Act (Cal. Civ. Code § 51), which guarantees individuals with disabilities full and equal access to the services, privileges, and public-facing platforms of business establishments, including media companies like Paramount and its subsidiaries. By denying Plaintiff accurate media representation, by casting aspersions on her credibility, and by willfully amplifying a defamatory portrayal of her disability, Defendants engaged in discriminatory conduct expressly prohibited by state civil rights law. The consequences were not hypothetical, they were devastating. Plaintiff was misjudged by physicians, denied timely care, and further traumatized by a media empire that knew the truth and chose to suppress it. This is not just editorial negligence. It is corporate malice endorsed, maintained, and protected at the highest levels of Paramount Global.

11.    Furthermore, Defendants' conduct also violates the Americans with Disabilities Act, Title III (42 U.S.C. § 12182), which prohibits discrimination on the basis of disability in public accommodations and services. Defendants' actions denied Plaintiff the full and equal enjoyment of their media services by refusing to consider, acknowledge, or incorporate her medically documented disability, even when directly presented with verified records. Paramount

was on notice of Plaintiff's condition and the real-world harm caused by their broadcast, yet refused to update or correct the segment.

12.    The refusal to act amounted to a denial of reasonable accommodation under Title III of the ADA in the equal representation, medical credibility, and dignified treatment to which disabled individuals are entitled. Paramount's deliberate editorial choices materially interfered with Plaintiff's access to public life, medical treatment, and societal inclusion, harms that nondisabled individuals do not face under similar circumstances. While others get the dignity of being believed, disabled individuals like Plaintiff are too often treated as punchlines. **Paramount Global made this their corporate policy.** It created precisely the type of stigma and exclusion that the Americans with Disabilities Act was enacted to prevent.

## PARTIES

13.    Plaintiff Desiree Guerriere Townsend ("Plaintiff") is a litigation and intellectual property paralegal residing in Los Angeles, California.

14.    Defendant Paramount Global is a Delaware corporation with its principal place of business in New York, New York. Paramount operates as a multinational media conglomerate and is publicly traded on the NASDAQ exchange under the ticker symbol PARA. Paramount owns and controls CBS Broadcasting Inc. and CBS Interactive Inc., and accordingly, exercises substantial authority over CBS's commercial operations, editorial decisions, and broadcast content.

15.    Paramount Global is a Delaware corporation with its principal place of business in New York, New York. Paramount maintains significant operations in California, including offices in Los Angeles, and owns and controls CBS Broadcasting Inc. and other affiliated entities that produce and disseminate media content throughout the state. Paramount is authorized to do

business in California and may be served through its registered agent for service of process in California: Corporation Service Company d/b/a CSC – Lawyers Incorporating Service Company, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833.

16.     On July 7, 2024, Paramount Global announced a definitive agreement to merge with Skydance Media in a transaction valued at approximately $8,000,000,000. The proposed deal would result in the formation of a new entity, tentatively named "New Paramount," with an estimated combined value of $28,000,000,000. The transaction is subject to federal regulatory approval and is currently under review by the Federal Communications Commission (FCC) pursuant to its standard 180-day timeline for evaluating significant media mergers. If approved, the merger is expected to close by September 2025.

17.     Defendant CBS Broadcasting Inc. is a New York corporation with its principal place of business in New York, New York. CBS Broadcasting Inc. is authorized to do business in the State of California and operates media, television, and news programming distributed throughout the United States, including significant operations within California. CBS is a wholly owned subsidiary of Paramount Global and may be served through its registered agent for service of process in California: Corporation Service Company d/b/a CSC – Lawyers Incorporating Service Company, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, CA 95833.

18.     Defendant Inside Edition Inc. is a New York corporation with its principal place of business in New York, New York. Inside Edition Inc. produces the nationally syndicated television program *Inside Edition*, which is distributed throughout the United States, including to viewers in California via broadcast television and digital platforms. Inside Edition Inc. is a subsidiary or affiliated entity of CBS Media Ventures, a division of Paramount Global. According to records maintained by the California Secretary of State, Inside Edition Inc. is currently listed

as "Forfeited – FTB," indicating that its corporate powers, rights, and privileges in California have been suspended by the California Franchise Tax Board. Nevertheless, Inside Edition Inc. continues to conduct business in California through the commercial distribution of its programming. It may be served through its California agent for service of process: Corporation Service Company d/b/a CSC – Lawyers Incorporating Service, 2710 Gateway Oaks Drive, Suite 150N, Sacramento, California 95833.

19.    **Inside Edition Inc.'s forfeited status with the California Franchise Tax Board for failure to meet tax requirements** reflects not only a disregard for basic compliance with California law, but also underscores a broader pattern of corporate negligence that permeates Paramount Global and its subsidiaries. While Defendants aggressively weaponize their media platforms and legal threats against individuals like Plaintiff, they themselves operate in clear violation of the state's corporate requirements. This contradiction further illustrates that Defendants' governance failures extend well beyond editorial misconduct and into systemic corporate irresponsibility.

## JURISDICTION AND VENUE

20.    This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a), as there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff Desiree Guerriere Townsend is a natural person domiciled in the State of California. Defendants Paramount Global, CBS Broadcasting Inc., and Inside Edition Inc. are corporations organized under the laws of Delaware and New York, with their principal places of business located in New York, New York. None of the Defendants are citizens of California for purposes of diversity jurisdiction.

21.     This Court also has supplemental jurisdiction over Plaintiff's state law claims
pursuant to 28 U.S.C. § 1367(a), as they are so related to the claims within the Court's original
jurisdiction that they form part of the same case or controversy.

22.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), as a substantial
part of the events and omissions giving rise to the claims occurred in this District. The defamatory
broadcast and related content at issue were disseminated in California, were accessible to
California residents, and caused harm to Plaintiff, who resides in this District. Defendants conduct
extensive business in California, including the production, distribution, and monetization of
media content through broadcast and digital platforms targeting California audiences.

23.     This Court also has personal jurisdiction over all Defendants pursuant to
California's long-arm statute, Cal. Code Civ. Proc. § 410.10, which permits the exercise of
jurisdiction on any basis not inconsistent with the United States Constitution. Defendants have
purposefully availed themselves of the privilege of conducting business in California, including
by broadcasting the defamatory segment within the state, maintaining ongoing business
relationships with California-based media entities and advertisers, and generating substantial
revenue from California-based viewership.

24.     Paramount Global maintains significant business operations in California through
its subsidiaries, including CBS Broadcasting Inc. and Inside Edition Inc., both of which regularly
target California markets through national syndication and streaming platforms. Defendant Inside
Edition Inc., although listed as "Forfeited – FTB" by the California Franchise Tax Board,
continues to conduct business within the state through the distribution of its television program
Inside Edition and derives commercial benefit from its California-based viewership.

## FACTUAL ALLEGATIONS

### A.    ORIGINAL DEFAMATORY BROADCAST

25.    Upon information and belief, in or around January 2010, employees, agents, or representatives acting on behalf of Inside Edition secretly filmed Plaintiff in public as she went about her daily life, months after the original segments depicting the severity of her symptoms had aired. At the time of this surreptitious filming, Plaintiff was under the ongoing care of a licensed neurologist and had been prescribed medication to alleviate the symptoms of her diagnosed neurological condition. This context, including her medical progress and treatment, was explicitly communicated to Inside Edition's production team and supported by medical records that were provided directly to them.

1.    Shortly after the initial filming of the segment in a shopping plaza parking lot, Defendants' journalist and production team accompanied Plaintiff to her home, where she voluntarily provided Inside Edition with a copy of medical documentation confirming her diagnosis and explaining the medication-related improvements in her condition. Inside Edition had everything they needed to tell the truth, yet chose to knowingly mislead the public.

2.    On or about February 4, 2010, Inside Edition aired a defamatory segment laced with innuendo and insinuation, portraying Plaintiff in a false light as either fabricating a serious medical condition or suffering from mental instability. This was done despite being in possession of medical documentation that directly explained the improvements in Plaintiff's condition, evidence that would have completely undermined the narrative Defendants chose to broadcast. Rather than present a truthful or balanced report, Inside Edition deliberately suppressed Plaintiff's medical records, and through a calculated editorial decision, produced a sensationalized hit piece knowingly misleading the public. **Their goal was not to inform, but to provoke outrage,**

generate virality, and profit from the public humiliation of a disabled woman, depriving her of the civil rights and dignity to which she is entitled. This was not journalism. It was exploitation masquerading as news.

### B.    2024–2025 VIRAL REPUBLICATION: RENEWED HARM & LIABILITY

**"This video does not appear on our digital platforms. It is unfortunate that you have been subjected to hateful comments, but we do not have the ability to police the behavior of people on online platforms we do not control."**

> -    Bettina Cataldi, Senior Manager of Publicity,
> CBS Media Ventures, April 17, 2025

3.    At the time of the original broadcast by Inside Edition on or about February 4, 2010, social media platforms such as Instagram and TikTok did not yet exist. Upon information and belief, the segment was not posted, distributed, or otherwise made available by Defendants on those platforms at the time of its initial airing.

4.    Upon information and belief, Paramount Global is the lawful owner of all copyrights held by CBS Broadcasting Inc., including those of its affiliates and subsidiaries. This ownership extends to all content and productions created by Inside Edition Inc. and aired on the *Inside Edition* program.

5.    Paramount Global's Form 10-K filed with the Securities and Exchange Commission (SEC) for the fiscal year ending December 31, 2024, characterizes itself as "fundamentally a content company," emphasizing that "copyright and other intellectual property laws that protect our content and related intellectual property are **extremely important to us**," https://www.sec.gov/ix?doc=/Archives/edgar/data/0000813828/000081382825000005/para-20241231.htm (last visited May 4, 2025). This admission underscores that Paramount's core value lies in the control and protection of its content, making a refusal to issue takedown notices

or enforce its copyrights when their defamatory or harmful content resurfaces a conscious, strategic decision.

6.      On or about March 10, 2025, Plaintiff discovered that, on or about June 19, 2024, actor and *Access Hollywood* host, Mario Lopez, recklessly republished Defendants' defamatory and copyright protected broadcast by sharing it to a new distribution platform, Instagram. Lopez's verified Instagram account maintains an audience of approximately 3.2 million followers, https://www.instagram.com/reel/C8Zx0QdpG9c (last visited May 4, 2025). Lopez's post echoed and amplified the same false and damaging narrative originally disseminated by Defendants. The video quickly gained traction, garnering over 1 million views, 15,000 likes, and nearly 1,000 comments, which triggered a wave of public ridicule and reputational harm to Plaintiff in 2024.



7.      On or about April 4 and 5, 2025, less than a month after Plaintiff confronted Mario Lopez on Instagram regarding the republication of the Defendants' defamatory broadcast, two

TikTok accounts, @lightlyseasonedmike (https://www.tiktok.com/@lightlyseasonedmike) and @didyoucatchthis (https://www.tiktok.com/@didyoucatchthis), republished the same defamatory content. One of the accounts reiterated the false narrative originally manufactured by Defendants, going so far as to mock Plaintiff's neurological disability, imitate her symptoms for entertainment, and publicly label her a "clout chaser" and a "hoax." These defamatory statements directly cited and relied upon Defendants' Inside Edition broadcast as purported "evidence," thereby reigniting and compounding the reputational harm first caused by Defendants' original publication and perpetuated through this republication.

8.      As of May 4, 2025, two TikTok videos consisting largely of the February 4, 2010 Inside Edition segment had collectively garnered approximately 4.4 million views, 300,000 likes, and nearly 8,000 comments and counting, further amplifying the reputational harm and public ridicule faced by Plaintiff,    https://www.tiktok.com/t/ZT2oJ14MG/    and https://www.tiktok.com/t/ZT2otJLVA/ (last visited May 4, 2025).





9.      On or about April 10, 2025, and after enduring nearly a week of thousands of hateful, derogatory, and demeaning comments on TikTok, Plaintiff conducted a Google search using her former name, Desiree Jennings, in an attempt to locate the source of the resurfaced video broadcast. During this search, Plaintiff discovered that a press release associated with the original Inside Edition segment remained publicly accessible on Paramount's CBS Media Ventures website. The press release, which appeared to endorse and promote the defamatory content, was available at the following URL: https://www.paramountpressexpress.com/cbs-media-ventures/shows/inside-edition/releases/?view=24173.

10.     On or about April 10, 2025, Plaintiff sent an email to three employees affiliated with CBS, Paramount, and Viacom CBS, listed as media contacts for the Inside Edition show on the Paramount/CBS Media Ventures corporate website. In the email, Plaintiff requested the removal of the press release associated with the original broadcast. She explained that, at the time of filming, she had provided the production team with medical documentation confirming she was undergoing treatment for her symptoms. She further detailed the ongoing harm the press release was causing and requested its removal from public view to prevent further reputational and emotional damage.

11.     On or about April 14, 2025, Bettina Cataldi, Senior Manager of Publicity for CBS, responded to Plaintiff's email stating that CBS "stand[s] by the accuracy of our report," but nonetheless agreed to remove the press release from the Paramount/CBS Media Ventures website.

12.     Despite the removal of the press release, the wave of online harassment did not subside. In response, on or about April 16, 2025, the Plaintiff emailed Ms. Cataldi again, requesting to be connected with a journalist or representative from CBS or one of its affiliated news organizations to help correct the public record. In her message, Plaintiff emphasized that it

was unacceptable to endure 16 years of public abuse and be told by strangers to "die" simply because she suffers from a neurological disease.

13.    On or about April 17, 2025, Plaintiff received a response from Ms. Cataldi containing a critical admission—one that, for the first time, **revealed that the February 4, 2010 broadcast at the center of this case had been materially altered.** Cataldi stated, "This video does not appear on our digital platforms. It is unfortunate that you have been subjected to hateful comments, but we do not have the ability to police the behavior of people on online platforms we do not control." Until this moment, Plaintiff had no knowledge that the original defamatory segment had been materially modified since its first publication. This revelation constituted Plaintiff's first notice of a material change to the publication marking a significant moment in the timeline of harm.

14.    On or about April 17, 2025, Plaintiff responded, indicating her intent to submit a formal demand for retraction pursuant to California Civil Code § 48a. In her response, Plaintiff emphasized that despite the video's removal from CBS's digital platforms, "it remains accessible on third-party social media platforms with strict copyright enforcement procedures raising a reasonable inference that CBS and/or its affiliates are not only aware of its continued existence, but may be tacitly permitting it to persist."

15.    On or about April 18, 2025, Plaintiff served Defendants with a formal retraction demand pursuant to California Civil Code § 48a, requesting a full retraction and the publication of a correction explicitly stating that Plaintiff was under active medical care for a neurological condition and was being treated with prescribed medication at the time of the original broadcast. The demand also called on Defendants to take reasonable steps to remove the segment's

republication from third-party social media platforms that maintain copyright enforcement procedures and takedown protocols. (*See* **Exhibit C**).

16.     On or about April 25, 2025, Defendants' outside litigation counsel, Jean-Paul Jassy of Jassy Vick Carolan LLP, responded on behalf of CBS Media Ventures and Inside Edition, flatly refusing to issue a retraction in response to Plaintiff's formal demand. (*See* **Exhibit D**). In a dismissive and legally inconsistent reply, Defendants claimed that the statute of limitations for any claim "expired well over a decade ago"—entirely ignoring Plaintiff's recent and first-time discovery of material modifications to the publication, as admitted by the Defendants themselves. **These modifications included the removal of the video from CBS's digital platforms, the deletion of the associated press release, and the continued allowance of Defendants' copyright-protected content to new audiences across social media platforms.**

17.     Defendants restarted the timeline for liability under the republication doctrine yet seek to avoid responsibility by relying on the original 2010 air date. In short, they admittedly materially altered and allowed the republication of the original segment, while claiming the protection of its original form and date. This is made all the more troubling by Paramount Global's own Form 10-K filing for the fiscal year ending December 31, 2024, in which it publicly declares that **"copyright and other intellectual property laws that protect our content and related intellectual property are extremely important to us."** (See ¶ 14). That promise, it appears, applies only when convenient for Paramount's corporate interests, not when its content is harming private citizens. Paramount cannot both claim the sanctity of its intellectual property to investors while turning a blind eye to the viral circulation of its own content when it causes real-world harm to individuals, especially those with disabilities.

18.     On or about the morning of April 28, 2025, Plaintiff sent a final email to Defendants' outside litigation counsel, Mr. Jassy, clearly stating her intent to initiate legal action against the Defendants. (*See* **Exhibit E** attached hereto.)

19.     On or about the evening of April 28, 2025, Plaintiff's personal and political campaign Instagram accounts, @cheerleader4change and @desiree4lamayor, were abruptly suspended, despite full compliance with Meta's Community Standards and minimal engagement with other users on the platform. (*See* **Exhibit F** attached hereto.) Nearly identical accounts remain publicly accessible on TikTok, a platform widely regarded as having stricter moderation protocols than Instagram, further underscoring the arbitrary and suspicious nature of the removal.

20.     The suspension occurred within hours of Plaintiff's final email to Defendants' outside litigation counsel, in which she formally confirmed her intent to file this lawsuit. The timing strongly suggests retaliatory action, potentially coordinated or influenced by Paramount or its affiliates, aimed at silencing and discrediting the Plaintiff's voice ahead of legal proceedings. That a major media conglomerate with expansive digital influence may have leveraged that influence to interfere with Plaintiff's online presence raises serious constitutional, ethical, and reputational concerns.

21.     The Plaintiff has lived as a private individual, deliberately avoiding the public eye, except for two brief, involuntary moments: first, when Defendants dragged her into national ridicule through their defamatory 2010 broadcast, and again in 2023, as part of a piece by NBC News following the death of controversial figure Dr. Rashid Buttar. At no point did Plaintiff seek fame, media attention, or public notoriety. Yet through no fault of her own, she is now once again being forcibly thrust into the spotlight, this time as the subject of widespread online abuse, cruel mockery, and even death threats. She is not being treated as a person, but as viral fodder, a

COMPLAINT

spectacle engineered by Defendants and sustained by their ongoing refusal to correct the record. This renewed public harassment is not the result of Plaintiff's conduct, but the direct and foreseeable consequence of Defendants' reckless editorial choices and malicious inaction.

22.     Defendants' conduct implicates not only civil liability, but also raises serious concerns under the Communications Act of 1934, as amended, which requires that the Federal Communications Commission (FCC) approve broadcast license transfers only when they serve "the public interest, convenience, and necessity." (See 47 U.S.C. § 310(d)). Paramount Global, as the parent company of CBS Broadcasting Inc. and Inside Edition Inc., is a federally licensed broadcaster entrusted with the use of public airwaves. By knowingly distorting the medical condition of a disabled woman, refusing to correct a defamatory narrative, and allowing harmful, outdated content to re-circulate on digital platforms, **Paramount has abused its platform and demonstrated a pattern of editorial and corporate misconduct that directly undermines its obligation to the public under federal law.** The pending merger between Paramount and Skydance Media is now subject to FCC review, and Plaintiff's experience exemplifies how unchecked media power can be weaponized to harm the very citizens these licenses are intended to serve.

### C.    BEYOND THE BROADCAST: A LIFE OF MERIT AND MEANING

23.     Defendants painted Plaintiff as nothing more than an attention-seeking, mentally unstable cheerleader, a caricature crafted for shock value and viral appeal. In reality, Plaintiff is a resilient, intelligent, and accomplished woman whose life's work, integrity, and dignity were callously trampled by a narrative designed to entertain at her expense.

24.     Plaintiff Townsend currently works as a litigation and intellectual property paralegal for law firms based in the Los Angeles area. She holds a Bachelor of Science in

Biochemistry and Molecular Biology from the University of California, Irvine (UCI), where she also conducted scientific research in the Gershon Laboratory, assisting in the analysis of mass spectrometry data related to the molecular structure of the vaccinia virus. Her STEM background qualifies her to sit for the United States Patent and Trademark Office (USPTO) registration exam to become a licensed patent practitioner.

25.     In the fall of 2024, Plaintiff spent several months in Washington, D.C., advocating for expanded access to legal services for underserved individuals and small businesses, as well as for the restoration of the trademark logo of former Washington Redskins figure Chief Two Guns White Calf. She lobbied members of Congress, including those on the Senate and House Judiciary Subcommittees on Intellectual Property, urging the creation of a federal registration system for non-attorney trademark practitioners. Modeled after the Patent Office's existing process for licensing patent agents, this proposed reform would significantly reduce the cost barrier to federal trademark protection by allowing qualified individuals to represent clients before the USPTO without a law degree. A 32-page draft of the proposed legislation, titled *The Chief Two Guns White Calf Trademark Integrity Act of 2025*, is currently under review by Congressman Lance Gooden of Texas and his legislative team.

26.     After years of immune-suppressive therapy and intensive lifestyle modifications to manage her disability, Plaintiff's condition eventually stabilized, allowing her to reenter the workforce full-time. Her first full-time position was as an intellectual property legal assistant at Outpace Bio, Inc., a biotechnology company headquartered in Seattle, Washington. There, she contributed to the development and management of the company's intellectual property portfolio, including pending and issued patents involving chimeric antigen receptor T-cell (CAR-T) technology. Despite receiving a stellar performance review, Plaintiff's employment was abruptly

and prematurely terminated just days later, after her employer discovered the defamatory narrative about her that had been widely circulated online by Defendants.

27.     The ongoing circulation of Defendants' defamatory broadcast continues to inflict tangible harm on Plaintiff's career prospects. In January 2024, Plaintiff interviewed with senior staff at the prominent law firm McDermott Will & Emery for a paralegal position. The interviews appeared to go well, with positive engagement and follow-up questions from multiple members of the hiring team. However, shortly after the final round of meetings, and following what Plaintiff reasonably believes was a routine Google search of her name, all communication from the firm abruptly ceased. No explanation was provided, and repeated attempts to follow up were ignored.

28.     A similar incident occurred in January of 2024 during an interview process with the legal department at Warner Bros. Discovery. In that case, Plaintiff proactively disclosed her past experience with viral media coverage and explained the defamatory nature of the segment during a candid conversation with the team. Despite receiving what appeared to be a warm and receptive response during the interview, she was again met with silence, no return communications, no rejection, and no further engagement. These patterns strongly indicate that the continued presence of Defendants' misleading and defamatory content online is serving as a silent but devastating professional barrier, undermining Plaintiff's hard-earned credibility and cutting off career opportunities for which she is objectively qualified.

29.     Prior to the Defendants' defamatory broadcast in 2010, Plaintiff was employed as a Marketing Communications Manager, where she developed scripting and authored internal content for the technical phone queues at AOL. Previously she worked within AOL's Public Relations and Communications Department on internal and external messaging initiatives, contributing to the company's corporate communication strategy. During the summer of 2009,

Plaintiff was selected to serve as a Washington Redskins Cheerleader Ambassador, representing the team at official events and community engagements.

30.     Plaintiff previously served as a registered securities representative at Morgan Stanley, one of the largest global investment firms. She held multiple advanced financial licenses, including Series 7, Series 66, and Series 31, authorizing her to advise clients and execute trades in securities, futures, options, and commodities. These credentials reflect a high level of financial acumen, professional trust, and regulatory clearance—further underscoring the reputational damage caused by Defendants' defamatory actions.

31.     Despite Plaintiff's extensive professional background, including work in intellectual property law, biotechnology, financial services, and federal legislative reform, Defendants' defamatory broadcast has cast a long, unrelenting shadow over her career. The viral, false narrative portraying her as mentally unstable has systematically undermined her credibility, derailed promising job prospects, and left her vulnerable to abrupt employment loss even after positive performance reviews. Prestigious law firms and legal departments that once welcomed her candidacy with enthusiasm have cut off contact after online searches revealed Defendants' broadcast. Employers have quietly passed judgment on the basis of misinformation, without ever allowing Plaintiff the chance to explain the truth. The defamatory segment continues to circulate in digital spaces, infecting search results and sabotaging her livelihood in ways that a correction or retraction could have mitigated. Instead, Defendants have chosen inaction, ensuring that the false narrative they created remains the loudest voice in the room whenever Plaintiff's name is spoken in professional circles.

### D.  PARAMOUNT'S TOXIC CULTURE: A LIABILITY TO SHAREHOLDERS

**"Please understand that if you bring any claim against Inside Edition, its affiliates or employees, we will respond vigorously, including by bringing an anti-SLAPP motion under**

**California Code of Civil Procedure § 425.16. If we prevail on such a motion—and we are confident that we would—then you would be required to reimburse Inside Edition for all attorneys' fees and costs."**

- Jean-Paul Jassy, Litigation Counsel to CBS Media Ventures/Inside Edition in response to the Plaintiff, April 25, 2025

32.     After weaponizing their media platform to defame and humiliate private individuals, Paramount Global and CBS further compound the harm by weaponizing their legal departments to deter accountability. In response to Plaintiff's formal retraction demand, **one that sought no monetary damages, only correction of the record**, Defendants responded not with empathy or responsibility, but with a threat. CBS's litigation counsel warned that any legal action would be met with an aggressive anti-SLAPP motion and a demand for attorneys' fees, a tactic designed not to defend journalistic truth, but to financially intimidate and bury a disabled *pro se* plaintiff in procedural warfare. This chilling response reflects a broader corporate strategy: exploit vulnerable individuals for content, then use deep-pocketed legal firepower to evade consequences. Rather than demonstrate editorial integrity or ethical concern, Paramount and CBS have institutionalized a culture of reputational harm and post-hoc legal intimidation, one where silence is coerced not by merit, but by money.

33.     Paramount Global and its subsidiary CBS are currently co-defendants in a high-profile federal lawsuit filed by President Donald J. Trump and Representative Ronny Jackson in the Northern District of Texas. The complaint alleges that CBS manipulated and deceptively edited a televised interview with Vice President Kamala Harris during the 2024 presidential election in order to mislead millions of viewers and tilt coverage in favor of a political opponent—all for commercial and political gain. The lawsuit asserts violations of the Lanham Act and Texas deceptive trade practices laws, specifically citing CBS's calculated "slice-and-dice" editing

tactics, refusal to release the full interview footage, and a chronic lack of editorial transparency. Far from an isolated incident, this lawsuit underscores an ongoing pattern of unethical editorial conduct and corporate governance failure at Paramount. The same lack of internal oversight, accountability, and integrity that enabled political manipulation in 2024 also enabled the defamation of the Plaintiff in 2010, and **continues to expose Paramount's shareholders to escalating legal and reputational risk.**

34.    In 2025, CBS and Paramount Global quietly settled a lawsuit brought by a former script coordinator for the television series *SEAL Team*. The plaintiff alleged defamation and wrongful termination after raising internal concerns about workplace misconduct. The lawsuit accused the companies of retaliatory conduct and damaging the Plaintiff's professional reputation. Though the terms of the settlement were not publicly disclosed, the matter reflects a recurring pattern at Paramount and CBS, wherein employees or contributors who challenge unethical behavior face reputational harm and career setbacks, followed by eventual legal resolution behind closed doors. The case underscores ongoing corporate governance failures and risk exposure stemming from Paramount's unwillingness to correct internal misconduct or protect individuals from reputational damage.

35.    In another high-profile example of CBS's disregard for truth and reputational harm, the network became the target of a $750 million defamation lawsuit filed by Burke Ramsey, the brother of JonBenét Ramsey, in 2016. The lawsuit arose from a CBS docuseries that falsely suggested Burke had been responsible for his sister's death, a sensational and speculative claim presented under the guise of journalism. Rather than correcting or retracting the defamatory insinuations, CBS defended the broadcast until ultimately settling the case in 2019. The Ramsey lawsuit reflects a familiar pattern: CBS's willingness to exploit deeply personal tragedies for

ratings, while ignoring the devastating consequences for the individuals they target. Paramount and its subsidiaries have repeatedly demonstrated that corporate gain takes priority over ethical reporting, due diligence, or accountability.

36.    Plaintiff brings this lawsuit, filed *pro se*, not only to seek justice for herself, but to serve as a beacon of hope for others who lack the financial resources to defend themselves. In a legal system too often governed by money, power, and institutional intimidation, this case stands as a challenge to those who have weaponized both media and the courts to defame, discredit, and silence the vulnerable. It is a call for accountability, and a blueprint for reclaiming dignity in the face of corporate cruelty.

### FIRST CLAIM FOR RELIEF
#### (Defamation/Defamation Per Se)
#### Plaintiff Townsend v. All Defendants

37.    Ms. Townsend hereby repeats, reiterates, re-alleges and incorporates by reference each and every allegation of the Complaint as if set forth fully herein.

38.    Ms. Townsend is a private figure.

39.    As alleged hereinabove, Defendants Paramount Global, CBS Broadcasting Inc., and Inside Edition Inc., through their agents and employees, including producers, editors, and legal counsel, published, caused the publication of, participated in the publication of, and/or reasonably should have foreseen that their conduct would result in the publication and viral dissemination of materially false and defamatory statements of fact about Plaintiff.

40.    Defendants Paramount Global, CBS Broadcasting Inc., and Inside Edition Inc., through their agents and employees, intentionally made false statements of fact and published content that conveyed a false and defamatory meaning about Plaintiff. The statements broadcast and disseminated by Defendants, through their program *Inside Edition*, are reasonably understood

to state and imply that Plaintiff was mentally unstable, dishonest, and seeking public attention under false pretenses. Defendants' broadcast further implied that Plaintiff fabricated or exaggerated a medical condition, misrepresented her character, and was unworthy of public trust or professional credibility, all of which were false and made with actual malice or reckless disregard for the truth.

41.    As a reasonably foreseeable, and in fact intended, consequence of Defendants' actions, third parties repeated, reposted, and amplified these false and defamatory statements across various media platforms, causing ongoing and compounding harm to Plaintiff's reputation, livelihood, and well-being.

42.    The defamatory nature of Defendants' video segment is apparent on its face. The segment, produced and published by Inside Edition, utilized misleading narration, selective editing, and sensationalized framing to convey false and defamatory impressions about Plaintiff, including that she was mentally unstable, dishonest, and seeking attention under false pretenses. These false statements and implications were presented as factual and were intended to subject Plaintiff to public ridicule and reputational harm. Upon information and belief, and as acknowledged by Defendants, the video segment has since been removed from Defendants' platforms, an implicit admission of its defamatory content and the harm it caused Plaintiff.

43.    The defamatory nature of Defendants' false and implied statements of fact is evident on the face of the publication itself, which, by deliberately omitting critical medical records and context, conveyed the false and defamatory implication that Plaintiff either fabricated her illness or was mentally unstable. This implication was not only false, but presented in a manner intended to ridicule and discredit Plaintiff in the eyes of the public. The following excerpts from Defendants' online article illustrate the defamatory framing:

**By Inside Edition**
Updated: 12:00 AM PST, February 4, 2010
First Published: 4:00 PM PST, February 3, 2010



Desiree Jennings is the woman who claimed she developed dystonia after receiving a seasonal flu shot, but INSIDE EDITION has observed her walking normally, playing with her dogs, and even driving! Is she cured? INSIDE EDITION investigates.

Her story created a national uproar. Desiree Jennings, an ambassador for the Washington Redskins cheerleading squad, claimed she developed a rare neurological disorder called dystonia after receiving a seasonal flu shot, causing dramatic spasms and slurred speech.

What made the story so startling is that her symptoms seemed to disappear when she walked backwards or ran.

Back in October 2009, Jennings and her husband told INSIDE EDITION's Les Trent they worried they'd never find a cure. But INSIDE EDITION cameras found her walking normally, playing with her dogs, going shopping, even getting behind the wheel of a car and driving!

## SECOND CLAIM FOR RELIEF
### (False Light Invasion of Privacy – California Const., Art. I, § 1)
### Plaintiff Townsend v. All Defendants

44.     Ms. Townsend hereby repeats, reiterates, re-alleges and incorporates by reference each and every allegation of the Complaint as if set forth fully herein.

45.     As alleged hereinabove, Defendants Paramount Global, CBS Broadcasting Inc., and Inside Edition Inc. publicly disclosed false and misleading information about Plaintiff's medical condition, personal history, and moral character, portraying her in a false light that was highly offensive to a reasonable person and designed to provoke public ridicule, humiliation, and distrust.

46.     The false light created by Defendants' disclosures would be highly offensive and objectionable to a reasonable person in Plaintiff's position, as it cast Plaintiff as mentally unstable and deceitful, making her the object of public scorn, ridicule, humiliation, and undeserved pity.

47.     Defendants knew, or acted with reckless disregard as to whether, their public disclosures would create a false and misleading impression about Plaintiff, namely, that she was

mentally unstable, dishonest, or fabricating her medical condition, and nevertheless proceeded with publication in conscious disregard of the truth.

48.     As a direct and proximate result of Defendants' false, misleading, and highly publicized disclosures, Plaintiff has sustained significant harm to her career, business opportunities, and personal reputation. Plaintiff has suffered, and continues to suffer, severe emotional distress, including anxiety, humiliation, and social isolation, stemming from the sudden and damaging shift in public perception caused by the Defendants' conduct. Furthermore, Defendants' actions have resulted in loss of income, interference with professional relationships, and the disruption of future earning potential across multiple sectors of Plaintiff's work and advocacy.

49.     The conduct of Defendants Paramount Global, CBS Broadcasting Inc., and Inside Edition Inc., as described herein, was a substantial factor in causing Plaintiff serious harm, constituted a grave invasion of her right to privacy, and represented an egregious breach of accepted societal norms, conduct so extreme and outrageous that it shocks the conscience. Defendants acted with oppression, fraud, and malice in broadcasting and amplifying false and misleading narratives about Plaintiff, and in failing to retract or correct the harm despite knowing the truth. Accordingly, Plaintiff is entitled to an award of punitive and exemplary damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
### (Intentional Infliction of Emotional Distress)
### Plaintiff Townsend v. All Defendants

50.     Ms. Townsend hereby repeats, reiterates, re-alleges and incorporates by reference each and every allegation of the Complaint as if set forth fully herein.

51.     Defendants' conduct, as alleged herein, was outrageous and carried out with the intent to cause Plaintiff severe emotional distress. Defendants acted with reckless disregard for the truth by deliberately omitting critical medical records and context that would have clarified the nature and trajectory of Plaintiff's condition. Instead, they presented a distorted narrative suggesting that Plaintiff had fabricated symptoms, suffered from mental instability, or was engaged in deception. This defamatory framing, disseminated nationally through the Inside Edition segment, was designed to provoke public ridicule and humiliation. Defendants knew, or acted with a high degree of certainty, that broadcasting such a segment about a private individual would result in significant emotional harm once it was distributed and repeatedly circulated to the public.

52.     As a direct and substantial result of Defendants' wrongful and malicious conduct, Plaintiff suffered severe emotional distress.

53.     Defendants' acts were willful, wanton, malicious, oppressive, and carried out in conscious disregard for Plaintiff's rights, thereby justifying an award of punitive and exemplary damages according to proof at trial.

## FOURTH CLAIM FOR RELIEF
### (Violation of California Civil Code § 3344)
### Plaintiff Townsend v. All Defendants

54.     Ms. Townsend hereby repeats, reiterates, re-alleges and incorporates by reference each and every allegation of the Complaint as if set forth fully herein.

55.     Plaintiff is a private individual whose name and likeness became widely recognizable as a result of viral media coverage beyond her control. Although not a public figure by profession, Plaintiff's image and identity have been used and disseminated without

authorization in a manner that exploited her likeness for commercial gain, in violation of her statutory and common law rights of publicity under California Civil Code § 3344.

56.    Defendants Paramount Global, CBS Broadcasting Inc., and Inside Edition Inc., without Plaintiff's prior consent, knowingly used Plaintiff's name, photograph, and likeness in connection with a nationally broadcast segment that originally aired in 2010. In April 2025, this segment was materially altered, republished, and widely redistributed across digital platforms, causing it to go viral once again. These renewed publications featured Plaintiff's image, identity, and likeness without authorization and for commercial purposes, including generating traffic and advertising revenue through Defendants' various media channels.

57.    Defendants' conduct constitutes a clear violation of California Civil Code § 3344, which prohibits the knowing use of another's name, voice, photograph, or likeness for purposes of advertising or selling goods or services without prior consent. As a direct and proximate result of Defendants' unauthorized use of Plaintiff's name, image, and likeness, Plaintiff has suffered substantial harm, including reputational damage, loss of professional and business opportunities, severe emotional distress, and economic injury. The defamatory and misleading nature of the republished Inside Edition segment has irreparably harmed Plaintiff's personal and professional standing, reigniting public ridicule and undermining years of effort to rebuild her career and reputation.

58.    Pursuant to California Civil Code § 3344(a), Plaintiff is entitled to the greater of $750 or actual damages, as well as any profits attributable to Defendants' unauthorized use of her name and likeness.

## FIFTH CLAIM FOR RELIEF
### (Violations of the California Unruh Civil Rights Act Cal. Civ. Code § 51)
### Plaintiff Townsend v. All Defendants

59.     Ms. Townsend hereby repeats, reiterates, re-alleges and incorporates by reference each and every allegation of the Complaint as if set forth fully herein.

60.     California Civil Code § 51, known as the Unruh Civil Rights Act, provides that all persons within the jurisdiction of California are entitled to full and equal accommodations, advantages, facilities, privileges, or services in all business establishments, regardless of sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status.

61.     Defendants Paramount Global, CBS Broadcasting Inc., and Inside Edition Inc. are business establishments within the meaning of the Unruh Civil Rights Act because they operate commercial media entities that distribute programming and content to the public for profit in the State of California.

62.     Plaintiff is a California resident who suffers from a rare and documented neurological condition that qualifies as a medical condition and/or disability under California law.

63.     Defendants, through their broadcast and subsequent republication of the Inside Edition segment, engaged in discriminatory and unequal treatment by portraying Plaintiff in a false and defamatory manner based on her medical condition. Defendants' conduct effectively denied Plaintiff equal dignity, subjected her to public ridicule, and exploited her condition for entertainment and profit without regard for her rights.

64.     Defendants, through the trademark INSIDE EDITION, publicly assert in United States Registration No. 5,749,893 that they provide "entertainment services, namely, a continuing multimedia series featuring news and current events rendered through the media of television,

cable, satellite and broadband systems, and via the Internet, and portable and wireless communication devices." As a member of the public, and as the unwilling subject of their broadcast, Plaintiff was entitled to equal dignity, accurate representation, and respectful treatment in the delivery of those services. Instead, Defendants denied Plaintiff the benefit of these services by portraying her disability in a defamatory, mocking, and exploitative manner. By using their platform to publicly distort Plaintiff's condition while omitting verified medical records, Defendants discriminated against her in the provision of a public-facing business service, in violation of the Unruh Civil Rights Act.

65.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered harm, including emotional distress, reputational damage, and economic loss.

66.    Plaintiff is entitled to statutory damages, injunctive relief, and any other relief the Court deems just and proper under Cal. Civ. Code § 52.

### SIXTH CLAIM FOR RELIEF
**(Violations of the Americans with Disabilities Act 42 U.S.C. § 12182)**
**Plaintiff Townsend v. All Defendants**

67.    Ms. Townsend hereby repeats, reiterates, re-alleges and incorporates by reference each and every allegation of the Complaint as if set forth fully herein.

68.    Title III of the Americans with Disabilities Act of 1990 ("ADA"), codified at 42 U.S.C. § 12182, prohibits discrimination on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases, or operates a place of public accommodation.

69.    Defendants Paramount Global, CBS Broadcasting Inc., and Inside Edition Inc. own and operate commercial media outlets that are open to the public and constitute "places of public

accommodation" under 42 U.S.C. § 12181(7)(E), which includes places of exhibition and entertainment, as well as service establishments engaged in public communications.

70.      Plaintiff is an individual with a rare and medically documented neurological condition that substantially limits one or more major life activities, qualifying her as a person with a disability under the ADA.

71.      Despite knowledge of Plaintiff's condition and access to medical records and factual context, Defendants chose to depict Plaintiff in a misleading and defamatory manner that exploited her disability for commercial purposes. The Inside Edition segment falsely portrayed Plaintiff as mentally unstable, dishonest, or attention-seeking, rather than truthfully representing her as a person managing a complex medical condition.

72.      By doing so, Defendants denied Plaintiff the full and equal enjoyment of services offered to the public, namely, fair, accurate, and non-discriminatory media coverage. Instead, Defendants used their platform to marginalize and demean Plaintiff on the basis of her disability.

73.      Defendants' actions constitute discrimination in violation of Title III of the ADA and reflect a failure to provide accessible, respectful, and nondiscriminatory services to individuals with disabilities.

74.      As a direct and proximate result of Defendants' conduct, Plaintiff has suffered substantial harm, including emotional distress, reputational injury, loss of professional opportunities, and economic damages.

75.      Plaintiff seeks declaratory and injunctive relief, including the removal of the defamatory content, as well as compensatory damages and any other relief the Court deems just and proper under 42 U.S.C. § 12188.

## PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgment as follows:

1.    For total damages in the amount of $100,000,000.

2.    For general damages, including emotional distress damages, according to proof on each cause of action for which such damages are available.

3.    For special damages, according to proof of each cause of action for which such damages are available.

4.    For compensatory damages, including emotional distress damages according to proof on each cause of action for which such damages are available.

5.    For punitive damages and/or exemplary damages, as allowed by law, in an amount according to proof on each cause of action for which such damages are available.

6.    For prejudgment interest and post-judgment interest according to law.

7.    For costs of suit incurred in this action.

8.    For such other and further relief that the Court deems proper and just.


Dated: May 6, 2025                                    By: _____
                                                      DESIREE GUERRIERE TOWNSEND
                                                      Plaintiff

# EXHIBIT A


citi
BALANCE TRANSFERS    0% intro APR
for 21 months

Citi® Diamond
Preferred® Card

Learn More

News ∨    • Live    More ∨        Search 🔍

**NEWS**

**NEWS**

# Flu Shot Woman







**By Inside Edition**
Updated: 12:00 AM PST, February 4, 2010
First Published: 4:00 PM PST, February 3, 2010

  

Desiree Jennings is the woman who claimed she developed dystonia after receiving a seasonal flu shot, but INSIDE EDITION has observed her walking normally, playing with her dogs, and even driving! Is she cured? INSIDE EDITION investigates.

Her story created a national uproar. Desiree Jennings, an ambassador for the Washington Redskins cheerleading squad, claimed she developed a rare neurological disorder called dystonia after receiving a seasonal flu shot, causing dramatic spasms and slurred speech.

What made the story so startling is that her symptoms seemed to disappear when she walked backwards or ran.

Back in October 2009, Jennings and her husband told INSIDE EDITION's Les Trent they worried they'd never find a cure. But INSIDE EDITION cameras found her walking normally, playing with her dogs, going shopping, even getting behind the wheel of a car and driving!

It's hard to believe the woman INSIDE EDITION producers have been discreetly observing over the last few weeks is the same woman who contributed to the flu shot scare. INSIDE EDITION sent Les Trent to ask Jennings about her remarkable recovery.





"We've been trying to reach you and you have not been returning our phone calls," Trent told Jennings after catching up with her in a parking lot.

"Oh, I'm sorry," she said.



"It looks like you've made a complete recovery," Trent told her.

"Well, I wouldn't say a complete recovery. I still have a lot of cognitive issues," she said.

So what happened? Did Desiree Jennings really suffer a one-in-a-million reaction to the seasonal flu shot, as she says, or is it all some kind of elaborate hoax? Or is it something else entirely?

INSIDE EDITION has obtained an official report on Jennings's case by the Centers for Disease Control. It states, "The admitting neurologist felt that there was a strong psychogenic component" to her symptoms. "Psychogenic" means that there is a mental or psychological cause for her spasms.

"The dramatic symptoms of movement and speech that Miss Jennings has been displaying are certainly not a reaction to the vaccine," says Dr. Steven Novella.

Novella is an Assistant Professor of Neurology at Yale who treats patients with dystonia, which what Jennings claimed she suffered from after the seasonal flu shot. He hasn't examined Jennings, but is convinced after viewing our video that her affliction is not dystonia.



"Just from looking at the video, a trained and experienced neurologist could say, 'This is not dystonia,' " he tells INSIDE EDITION.

Jennings finds the idea that her illness is all in her head ridiculous.

"Some people think it was psychogenic. Some people might even think it's a hoax," Trent told Jennings.

"I mean people are free to believe whatever they want but clearly what I've been going through, I know it's not psychogenic and it's not a hoax," she said.

And something else that surprised INSIDE EDITION producers? Jennings is now speaking with a foreign accent she never had before.

"I'm from Ohio. I should not be talking like this," she told Trent.



SPONSORED CONTENT
Get Coverage for Your Motorcycle Today ↗
By State Farm                    Learn More

"It sounds like you have an Australian accent," Trent observed.

"Yeah, I've heard Australian, British, but it essentially comes down to the inability to pronounce words," she explained.

"There's no way a flu shot can cause someone's accent to change. Absolutely not," Dr. Novella says.

So how does Jennings explain her recovery? She credited a doctor, an alternative practitioner named Rashid Buttar. He claims he reversed many of her symptoms in less than 48 hours using controversial therapies, including a hyperbaric chamber and intravenous injections of nutrients and synthetic amino acids.

But Buttar has come under fire for his practices. The North Carolina medical board claims he engaged in "unprofessional conduct" for charging cancer patients "exorbitant fees" for "unproven" and "ineffective" treatments, some of the very same treatments Jennings received. He denies any wrongdoing.

"Are you concerned that your case has generated so much interest and in particular has politicized the whole issue of vaccines?" Trent asked her.



Citi Double Cash® Card
citi
Earn $200 cash back after qualifying purchases
LINDA WALKER
Learn More                    citi

"No, not really. It's just what happened to me," she said.

INSIDE EDITION has to point out one other thing. When Jennings first walked out

of a store aisle, stone wrapping, Jennings claims to be walking normally, but as she left to get into her car, she was walking sideways. She says it was because of the dystonia.

She also told INSIDE EDITION, "Don't catch me driving 'cause I don't think I'm supposed to be driving."

Jennings is no longer seeing the controversial Dr. Buttar, but she did show INSIDE EDITION a report from a doctor who also believes her symptoms were vaccination-induced.



Tags:

recovery    doctor    report    shopping    illness    ohio    cancer    store    fire    washington    rare    phone    official    disease    patient



**Inside Deals: Save Up to 80% — Sharper Image Steam Cleaner, JVC Bluetooth Headphones, Born Pajama Set**
Inside Edition



**Inside Deals: Save Up to 87% — Cuisinart Set, Brilliant Diamonds Earrings, Greater Goods Blood Pressure Kit**
Inside Edition



**AI Bot Flips Wall Street on Its Head: Turns $1K into $50K in Record 30 Days**
FX Market Insights | Sponsored

Read More

# EXHIBIT B

 **Outlook**

---

**Re: Request for Removal of Harmful Press Release Dated 02/04/2010**

---

**From** Cataldi, Bettina <Bettina.Cataldi@cbs.com>

**Date** Thu 4/17/2025 12:45 PM

**To** Desirée Townsend <desiree@hollywoodtrademarks.com>

**Cc** Gaudio, Samantha <Samantha.Gaudio@viacomcbs.com>; Admin <admin@hollywoodtrademarks.com>

Dear Ms. Townsend,

This video does not appear on our digital platforms. It is unfortunate that you have been subjected to hateful comments, but we do not have the ability to police the behavior of people on online platforms we do not control.

Bettina

---

**From:** Desirée Townsend <desiree@hollywoodtrademarks.com>
**Sent:** Wednesday, April 16, 2025 2:14 PM
**To:** Cataldi, Bettina <Bettina.Cataldi@cbs.com>
**Cc:** Gaudio, Samantha <Samantha.Gaudio@viacomcbs.com>; Erik Alberts <erik.alberts@ea-lawfirm.com>; Admin <admin@hollywoodtrademarks.com>
**Subject:** Re: Request for Removal of Harmful Press Release Dated 02/04/2010

<External Email>

Hello Ms. Cataldi,

I respectfully ask that you please put me in touch with one of your journalists or news organizations. This is unacceptable abuse to continue to be subjected to for 16 years. **In 2025, I should not be told by people to DIE because I have a disease.**



Best regards,
Desireé

---
**Desirée S. Townsend**
**Senior Paralegal**
Phone: (323) 844-1338
Email: desiree@hollywoodtrademarks.com
hollywoodtrademarks.com



On Apr 15, 2025, at 7:18 PM, Desirée Townsend <desiree@hollywoodtrademarks.com> wrote:

Dear Ms. Cataldi,
I hope this message finds you well. I'm writing with one more request, and I completely understand if it's outside your purview, but I felt it was worth asking.
In the past week, I've gone viral again on TikTok after two users posted the following videos, which have **received collectively 3 million views and counting.**

- https://www.tiktok.com/t/ZT2oJ14MG/
- https://www.tiktok.com/t/ZT2otJLVA/

I am now receiving tens of thousands of views and **thousands of hateful, derogatory, and even threatening comments:**

- https://www.tiktok.com/t/ZTjLYWgVU/
- https://www.tiktok.com/t/ZTjLYvp2R/

Much of the public's perception fueling these comments stems from the Inside Edition segment that aired in 2010. I have no intention of pursuing legal action, but I am respectfully asking if your organization might consider helping me set the record straight. At the time of filming, I informed the journalist I was on medication and provided supporting medical documentation. Unfortunately, this information did not make it into the final cut. Since then, I've spent years trying to clear my name and correct the record.

I would be open and willing to participate in a follow-up segment with Inside Edition or any other CBS affiliate. I can provide all relevant medical records and address any questions with full transparency. This ongoing public misconception continues to cause significant reputational harm, has led to lost employment opportunities, affects the attorney I currently work for (copied here), and has caused me deep emotional distress.

If you or someone from your team could connect me with a producer or journalist interested in revisiting this story in the spirit of transparency and accountability, I would be deeply grateful.

Thank you so much for your time and consideration.

Warm regards,

Desirée

---

**Desirée S. Townsend**
**Senior Paralegal**
Phone: (323) 844-1338
Email: desiree@hollywoodtrademarks.com
hollywoodtrademarks.com





On Apr 14, 2025, at 10:10 AM, Cataldi, Bettina <Bettina.Cataldi@cbs.com> wrote:

Hi Desiree,

We received your email and stand by the accuracy of our report. However, as a courtesy, we are removing the press release from our website.

---

**From:** Desirée Townsend <<u>desiree@hollywoodtrademarks.com</u>>
**Sent:** Thursday, April 10, 2025 1:52 PM
**To:** Cataldi, Bettina ▮▮▮▮▮▮▮▮▮▮; Strichman, Hayley ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Gaudio, Samantha ▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; ▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮
**Subject:** Request for Removal of Harmful Press Release Dated 02/04/2010

<External Email>

Dear Paramount/CBS Media Ventures Team,

I am writing to formally request the removal of a press release published by your organization on February 4, 2010, titled "*Real, A Hoax, Or Something Else…Did A Flu Shot Cause Woman to Get Dystonia?*" which is still accessible at the following link: <u>https://www.paramountpressexpress.com/cbs-media-ventures/shows/inside-edition/releases/?view=24173</u>

At the time of filming with Inside Edition, **I provided medical documentation confirming I was undergoing treatment for symptoms** that were ultimately diagnosed as Stiff Person Syndrome, a rare and serious neurological condition. Despite this, the release and associated segment imply that my illness was a hoax or psychogenic in nature, relying on selectively presented information provided by the CDC rather than the actual records from my treating physician.

Although this publication may fall outside the statute of limitations for legal action, the continued public availability of this release is deeply harmful and misleading. It undermines my credibility, stigmatizes a legitimate medical condition, and has caused ongoing reputational damage—particularly as I prepare to enter public service with a campaign for Mayor of Los Angeles.

This press release has not aged well, and its framing contributes to the harmful practice of dismissing women's medical conditions as psychological without basis. In the interest of fairness and accuracy, I respectfully request that your organization remove this content from public view.

Thank you for your time and understanding. I look forward to your response.

Best regards,
Desireé

---

**Desirée S. Townsend**
**Senior Paralegal**
Phone: (323) 844-1338
Email: desiree@hollywoodtrademarks.com
hollywoodtrademarks.com



# EXHIBIT C

**DESIRÉE TOWNSEND**

IP & LITIGATION PARALEGAL

☎ (323)-844-1338

✉ desiree@hollywoodtrademarks.com

📍 2901 Ocean Park Blvd., Ste. 201
Santa Monica, California 90405

April 18, 2025

**VIA CERTIFIED MAIL & E-MAIL**

Bettina Cataldi
CBS Media Ventures / Inside Edition
c/o Paramount Global
555 W 57th Street
New York, NY 10019
Bettina.Cataldi@cbs.com

Koy Saechao
Agent for Service of Process
c/o Paramount Global
2710 Gateway Oaks Drive
Sacramento, CA 95833

Re:    **FORMAL RETRACTION DEMAND PURSUANT TO CALIFORNIA CIVIL CODE § 48a**

Dear Ms. Cataldi,

I am writing to submit a formal demand for retraction pursuant to California Civil Code § 48a, in connection with the *Inside Edition* segment published and broadcast by CBS Media Ventures on or about February 3, 2010, and featuring myself, Desirée Townsend (formerly known as Desiree Jennings). The segment remains publicly accessible here: https://www.insideedition.com/159-flu-shot-woman. Interestingly, while the accompanying video segment has long since been removed, the originally published article remains readily accessible through a simple Google search. Even the article's headline is demeaning and reductive, referring to me merely as "Flu Shot Woman" rather than acknowledging the complexity of my condition or the fact that I was ultimately diagnosed with a rare neurological disease.

On or about April 10, 2025, I formally requested that your organization remove a related press release, nearly identical in language to the article above, which falsely insinuates that I fabricated a medical condition and that your camera crew captured me in the act of malingering. This implication is entirely refuted by medical records I provided to your journalist at the time of

1

  

**DESIRÉE TOWNSEND**
IP & LITIGATION PARALEGAL

📞 (323)-844-1338
✉️ desiree@hollywoodtrademarks.com
📍 2901 Ocean Park Blvd., Ste. 201
Santa Monica, California 90405

filming, including documentation from my treating physician confirming that I was undergoing legitimate medical treatment and actively prescribed medication during the period in question. These records were intentionally excluded from the final edit, resulting in a broadcast that was incomplete, misleading, and defamatory by omission. Despite being notified of these omissions and of the continued weaponization of your content against me, your organization has failed to issue any clarification, correction, or update to the public record. However, your public relations team did agree to remove the original press release.

Furthermore, your organization has permitted the rampant reproduction and republication of this original, copyright-protected broadcast, which has recently flourished across social media platforms. On or about June 19, 2024, actor and *Access Hollywood* host Mario Lopez republished **your copyrighted content**, accompanied by defamatory commentary, on his personal and verified Instagram account. The post can be viewed here: https://www.instagram.com/reel/C8Zx0QdpG9c/.





In an apparent attempt to capitalize on the virality of this inflammatory content, more third parties have recently republished the defamatory material on the social media platform TikTok. On or about April 4 and April 5, 2025, two separate TikTok accounts posted videos that have collectively garnered over 3.5 million views and counting. These videos closely replicate the same defamatory narrative presented in your original segment, **thereby renewing and amplifying the reputational harm caused by your organization.** (See https://www.tiktok.com/t/ZT2oJ14MG/ for the April 4th video and https://www.tiktok.com/t/ZT2otJLVA for the April 5th).



**DESIRÉE TOWNSEND**
IP & LITIGATION PARALEGAL

 949-813-9373

 desiree@hollywoodtrademarks.com

2901 Ocean Park Blvd., Ste. 201,
anta Monica, California 90405

Your organization is well-known for routine enforcement of copyright protections, including aggressive cease-and-desist notices and even federal copyright infringement litigation (e.g. *CBS Operations Inc. v. ComedyMX LLC et al.*). Which makes this **selective inaction** especially troubling. To evaluate your organization's copyright enforcement practices, I personally reposted the segment with minor edits on TikTok and Instagram. Notably, the content did not trigger any copyright enforcement or takedown measures on either platform, unlike with other CBS-owned content, which regularly results in immediate removal. This strongly suggests that CBS is knowingly permitting the ongoing circulation of this segment, thereby allowing renewed public interest and engagement around *Inside Edition* at my expense.

As a direct result of your organization's original segment and its continued republication, I have lost employment opportunities and remain fearful of losing current employment due to the enduring reputational damage. The relentless public mischaracterization has caused severe emotional distress, including episodes of depression, suicidal ideation, and worsening of my neurological autoimmune disease, which had previously been under control. Your refusal to correct or retract the defamatory content is not only prolonging the harm, it is actively exacerbating my medical condition and psychological well-being.

In light of this pattern, your failure to act, or to correct the public narrative, appears to be a conscious and strategic choice, rather than mere oversight. By knowingly permitting the continued public distribution of its copyrighted segment, including through platforms where it has the legal right and technical means to enforce takedown, CBS has facilitated the republication of defamatory content to a new audience. This inaction, following direct notice of harm, constitutes a reckless disregard for the truth and **supports my renewed claims against your organization for defamation, false light, and negligent infliction of emotional distress.**

Accordingly, I hereby demand that CBS and Inside Edition:

- **Issue a retraction of the original segment**, publicly acknowledging its misleading nature and omission of critical medical evidence;
- **Publish a correction clearly stating that, at the time of filming, I was under active medical care for a neurological condition which included treating medications** — medical documentation of which was provided to your organization.
- Take all reasonable and timely measures to ensure that the segment is no longer being **distributed, monetized, or publicly accessible without proper correction or clarification by CBS, Inside Edition, or any affiliated entities or licensees** — including the prompt filing of takedown requests with platforms such as Facebook, Instagram, TikTok, and YouTube.





**DESIRÉE TOWNSEND**

IP & LITIGATION PARALEGAL

(323)-844-1338

desiree@hollywoodtrademarks.com

2901 Ocean Park Blvd., Ste. 201
Santa Monica, California 90405

Failure to comply with this demand will leave me no choice but to pursue immediate legal action for defamation, false light, intentional infliction of emotional distress, and other applicable torts under California law. Pursuant to California Civil Code § 48a, I am formally requesting that your organization issue a full and adequate retraction and correction. If I do not receive a response **within fourteen (14) days of this letter,** I will proceed with filing a legal Complaint against your organization and will seek general, special, and punitive damages. These special damages include, but are not limited to: loss of employment and future professional opportunities, reputational harm, out-of-pocket medical expenses resulting from the exacerbation of my autoimmune condition, and mental health treatment costs arising from the severe emotional distress caused by your continued inaction.

Nothing in this letter, nor any act or omission to act on my part, or should be deemed to be a waiver, abridgment, alteration, modification or reduction of any right, claims, defenses, and remedies that I may have regarding this matter and all such rights, claims, defenses, and remedies, whether at law or in equity, are hereby expressly reserved.

I urge your organization to take this demand seriously. Should you have any questions or wish to discuss this matter further, please contact me directly.

Sincerely,

Desirée Guerrière Townsend

4

# EXHIBIT D

# JASSY | VICK | CAROLAN

### LOS ANGELES  SAN FRANCISCO

355 South Grand Avenue, Suite 2450 | Los Angeles, CA 90071 | **T** 310.870.7048 | **F** 310.870.7010 | J A S S Y V I C K . C O M

Jean-Paul Jassy
jpjassy@jassyvick.com

April 25, 2025

*VIA E-MAIL AND U.S. MAIL*

Desirée Townsend
2901 Ocean Park Blvd., Ste. 201
Santa Monica, CA 90405
desiree@hollywoodtrademarks.com

      Re:    *February 2010* Inside Edition *Report*

Dear Ms. Townsend:

      I am outside litigation counsel to CBS Media Ventures/Inside Edition ("Inside Edition"), and am writing in response to your April 18, 2025 retraction demand letter (the "April 18 Letter"). For reasons explained further below, Inside Edition will not be issuing a retraction in response to your demand.

      Your retraction demand concerns an Inside Edition report first published over 15 years ago (the "Report"). The statute of limitations on any conceivable claim related to the Report expired well over a decade ago. *See, e.g.,* Cal. C. Civ. Proc. § 340(c) (one-year statute of limitations for defamation); *Roberts v. McAfee, Inc.,* 660 F.3d 1156, 1169 (9th Cir. 2011) (affirming application of one-year statute of limitations to defamation and false light claims); *see also* Cal. C. Civ. Proc. § 335.1 (other types of torts have a two-year statute of limitations); *Wassmann v. S. Orange Cnty. Commt'y College Dist.,* 24 Cal. App. 5th 825, 852-53 (2018) (applying two-year statute to claim for intentional infliction of emotional distress); *Sahadi v. Schaeffer,* 155 Cal. App. 4th 704, 715 (2007) (same for negligence). The statute of limitations for any claim based on the Report accrued with the first publication, which your April 18 Letter correctly acknowledges was in February, 2010. Cal. Civ. C. § 3425.3 (single publication rule starts accrual of statute of limitations at first publication); *see also Shively v. Bozanich,* 31 Cal. 4th 1230, 1245-46 (2003) (same). This rule applies where, as here, material remains continuously on the internet. *Traditional Cat Assn., Inc. v. Gilbreath,* 118 Cal. App. 4th 392, 397-405 (2004). Thus, even if you ever had a viable claim—and we dispute that you ever did—it was time-barred many years ago.

      Your April 18 Letter notes that, at your request and as a courtesy to you, Inside Edition recently removed a press release that was posted online related to the subject matter of the Report (the "Press Release"). That Press Release was first published in February, 2010. Thus,

although you do not specifically threaten any claim based on the Press Release, any such claim
would also be time-barred.

Similarly, to the extent your April 18 Letter invokes California's retraction statute, the
demand itself is, among other defects, also untimely and therefore unavailable here. Cal. Civ. C.
§ 48a(a) (retraction demands must be made within 20 days of publication).

To be clear, Inside Edition rejects any suggestion that its Report was defamatory or
otherwise could have ever given rise to any type of viable legal claim at any time. Inside Edition
accurately reported on your condition both when you first injected yourself into the public
sphere, and in its follow up reporting in February 2010, which raised questions and included
your comments and position. *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1094 (4th Cir. 1993)
("inquiry itself, however embarrassing or unpleasant to its subject, is not accusation"); *Thomas v.
Los Angeles Times Commc'ns LLC*, 189 F.Supp.2d 1005, 1016 (C.D. Cal. 2002) (quoting from
and endorsing *Chapin*'s rule that "raising of questions" is not actionable). You are a public figure
on the issue of your medical condition, as well as more generally in your capacity as a candidate
for mayor of Los Angeles. Because you are a public figure, any publication-based claim would
need to be proven with actual malice—*i.e.*, knowledge of falsity or reckless disregard for the
truth—with clear and convincing evidence "such as to command the unhesitating assent of every
reasonable mind." *Beilenson v. Superior Court*, 44 Cal. App. 4th 944, 950 (1996); *see also
Monitor Patriot Co. v. Roy*, 401 U.S. 265, 273 (1971) (candidates for public office must prove
actual malice); *Reader's Digest Ass'n v. Superior Court*, 37 Cal.3d 244, 253 (1984) (persons who
voluntarily seek attention on a matter of public interest are subject to the actual malice standard).
Even if your threatened claims were not time-barred (and they are), you would not be able to
satisfy the actual malice standard because there is no evidence that Inside Edition acted with
actual malice in its reporting. And your April 18 Letter's suggestion that Inside Edition was
somehow obligated to include particular materials or positions is not supported under the law:
"The choice of material to go into a [broadcast] . . . constitute[s] the exercise of editorial control
and judgment," and is protected under the First Amendment. *Miami Herald Publ'g Co. v.
Tornillo*, 418 U.S. 241, 258 (1974). Inside Edition had no obligation to include your "talking
points," or what you considered to be "key facts" or "context" into its Report. *Paterno v.
Superior Court*, 163 Cal. App. 4th 1342, 1352-55 (2008).

Your communications this month, including the April 18 Letter, also express your
concerns about the actions of third parties on social media (*e.g.,* Instagram and TikTok) posting
and reposting materials and comments online. Inside Edition has no control over such third
parties or their actions and cannot be held responsible for what they post online. Additionally,
Inside Edition is immune from liability for such conduct under 47 U.S.C. § 230(c)(1) of the
Communications Decency Act ("Section 230"). *See also Barrett v. Rosenthal*, 40 Cal. 4th 33, 39,
58-62 (2006) (applying Section 230 immunity to claims based on third party's online
publication).

Contrary to contentions in your April 18 Letter, Inside Edition is not required to engage
in the process of issuing takedown notices across the internet at your request. Inside Edition has
no legal obligation to demand the takedown of third party content, whether at its own impetus or

April 25, 2025
Page 3

at the request of others such as yourself.[1]  You do not cite, and we are not aware of, any authority to support the proposition that a copyright holder's decision not to pursue claims of copyright infringement can restart the statute of limitations for defamation or any other tort.  Nor are we aware of any authority to support the proposition that a defendant must pursue copyright infringement claims against all infringers or else lose the ability to raise the statute of limitations as a defense.  Indeed, this unsupported theory would run contrary to the basic rule that ongoing internet publications are not considered continuing torts, *see Traditional Cat Assn.*, 118 Cal. App. 4th at 399-404, and it would also violate the basic rule that publishers cannot be held liable for failing to retract a statement upon which doubt is placed after publication, *see, e.g., D.A.R.E. America v. Rolling Stone Magazine*, 101 F.Supp.2d 1270, 1287 (C.D. Cal. 2000) ("There is no authority to support Plaintiffs' argument that a publisher may be liable for defamation because it fails to retract a statement upon which grave doubt is cast after publication.").

You have no viable claim against Inside Edition.  Please understand that if you bring any claim against Inside Edition, its affiliates or employees, we will respond vigorously, including by bringing an anti-SLAPP motion under California Code of Civil Procedure § 425.16.  If we prevail on such a motion—and we are confident that we would—then you would be required to reimburse Inside Edition for all attorneys' fees and costs.  *Ketchum v. Moses*, 24 Cal. 4th 1122, 1131 (2001) ("under Code of Civil Procedure section 425.16, subdivision (c), any SLAPP defendant who brings a successful motion to strike is entitled to mandatory attorney fees").

The foregoing is not a full recitation of facts or law.  All rights, positions and arguments are expressly reserved.

Sincerely,

Jean-Paul Jassy
JASSY VICK CAROLAN LLP

---

[1] We note also that even you are using portions of the Report on your TikTok account in a purported effort to "rebut"—which apparently revived attention for—Inside Edition's 15-year-old story.  *See, e.g.,* https://www.tiktok.com/@cheerleader4change/video/7492305707371613486 (using the Report to compare yourself to Celine Dion). That post comes amidst many other TikTok posts concerning your mayoral campaign, and unwarranted threats to sue CBS, *e.g.,* https://www.tiktok.com/@cheerleader4change/photo/7494692340292914475, https://www.tiktok.com/@cheerleader4change/photo/7495056455649725739, and a claim that you "head[] a law firm's litigation arm," https://www.tiktok.com/@cheerleader4change/video/7496148600779705646, even though you are not a member of the Bar.

# EXHIBIT E

From: **Jean-Paul Jassy** jpjassy@jassyvick.com  📎
Subject: Re: February 2010 Inside Edition Report
Date: April 28, 2025 at 9:43 AM
To: Desirée Townsend desiree@hollywoodtrademarks.com

Dear Ms. Townsend,

We stand by our response.  My client can be served through its designated agent for service of process, CSC.  Paramount Global would not be a proper defendant as it had nothing to do with the Report, and is simply the ultimate corporate parent of CBS Media Ventures.

Sincerely,
JP Jassy


**Jean-Paul Jassy**

Jassy Vick Carolan LLP | 310-870-7048 | jpjassy@jassyvick.com
355 S. Grand Ave., Suite 2450 | Los Angeles, CA 90071
jassyvick.com

This email may contain confidential and/or privileged material.  Any review or distribution by anyone other than the intended recipient is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies of this email immediately.  This email does not establish an attorney-client relationship.

On Fri, Apr 25, 2025 at 3:20 PM Desirée Townsend <desiree@hollywoodtrademarks.com> wrote:
Dear Mr. Jassy,

I acknowledge receipt of your April 25, 2025 letter. Your arguments regarding the statute of limitations, Section 230, and the applicability of the First Amendment are noted but fundamentally mischaracterize the current posture of the case.

The harm at issue is not limited to the original 2010 broadcast. It includes Inside Edition's ongoing republication, continued monetization, and deliberate refusal to correct materially false representations despite being placed on actual notice. New harm gives rise to new claims, and Inside Edition's role as the original creator and publisher of the defamatory content forecloses reliance on Section 230. As confirmed by the California Supreme Court in *Barrett v. Rosenthal*, 40 Cal. 4th 33 (2006), Section 230 immunity does not extend to original creators of harmful content. **Inside Edition is not a neutral platform but the primary source of the false and misleading material at issue, and therefore remains fully liable for the damage caused.**

I intend to move forward accordingly.

**Please also confirm whether you are authorized to accept service of process on behalf of Inside Edition, CBS Media Ventures, and/or Paramount Global.**

Sincerely,
Desirée Townsend

---

**Desirée S. Townsend**
**Senior Paralegal**
Phone: (323) 844-1338
Email: desiree@hollywoodtrademarks.com
hollywoodtrademarks.com



On Apr 25, 2025, at 11:50 AM, Jean-Paul Jassy <jpjassy@jassyvick.com> wrote:

Dear Ms. Townsend,

Please see the attached letter, which is also being sent by US mail.

Please see the attached letter, which is also being sent by US mail.

Sincerely,
JP Jassy

**Jean-Paul Jassy**

Jassy Vick Carolan LLP | 310-870-7048 | jpjassy@jassyvick.com
355 S. Grand Ave., Suite 2450 | Los Angeles, CA 90071
jassyvick.com

This email may contain confidential and/or privileged material.  Any review or distribution by anyone other than the intended recipient is strictly prohibited.  If you are not the intended recipient, please contact the sender and delete all copies of this email immediately.  This email does not establish an attorney-client relationship.

<Letter, Jassy to Townsend, 04 25 25.pdf>

# EXHIBIT F

**From:** **Instagram** no-reply@mail.instagram.com
**Subject:** Action needed on your account, desiree4lamayor
**Date:** April 28, 2025 at 6:21 PM
**To:** media@hollywoodtrademarks.com



 Instagram

## Take action or lose access to desiree4lamayor

Hi desiree4lamayor,

Your Instagram account has been suspended. This is because your account, or activity on it, doesn't follow our Community Standards on account integrity.

If you think we made a mistake, you have until October 26, 2025 to appeal.



### desiree4lamayor

**Review details**

If you don't take action, your account will be permanently disabled.

from

∞ Meta

© Instagram. Meta Platforms, Inc., 1601 Willow Road, Menlo Park, CA 94025

This message was sent to media@hollywoodtrademarks.com and intended for desiree4lamayor.

**From:** **Instagram** no-reply@mail.instagram.com
**Subject:** Action needed on your account, cheerleader4change
**Date:** April 28, 2025 at 6:21 PM
**To:** media@hollywoodtrademarks.com



 | *Instagram*

## Take action or lose access to cheerleader4change

Hi cheerleader4change,

Your Instagram account has been suspended. This is because your account, or activity on it, doesn't follow our [Community Standards on account integrity](#).

If you think we made a mistake, you have until October 26, 2025 to appeal.



### cheerleader4change

**Review details**

If you don't take action, your account will be permanently disabled.

from
**∞ Meta**

© Instagram. Meta Platforms, Inc., 1601 Willow Road, Menlo Park, CA 94025

This message was sent to media@hollywoodtrademarks.com and intended for cheerleader4change.