**JASSY VICK CAROLAN LLP**
JEAN-PAUL JASSY, Cal. Bar No. 220513
jpjassy@jassyvick.com
NICHOLAS R. HARTMANN, Cal. Bar No. 301049
nhartmann@jassyvick.com
355 South Grand Avenue, Suite 2450
Los Angeles, California 90071
Telephone: 310-870-7048
Facsimile: 310-870-7010

Attorneys for Defendants
PARAMOUNT GLOBAL,
CBS BROADCASTING INC., and
INSIDE EDITION INC.

**UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION**

| | |
|---|---|
| DESIREE GUERRIERE TOWNSEND, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>PARAMOUNT GLOBAL, a Delaware corporation; CBS BROADCASTING INC., a New York corporation, and INSIDE EDITION INC., a New York corporation,<br><br>Defendants. | Case No. 2:25-cv-04077-MRA-DFM<br><br>Honorable Mónica Ramírez Almadani<br><br>**DEFENDANTS' NOTICE OF MOTION AND MOTION TO DISMISS SIXTH CLAIM FROM FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Defendants' Special Motion to Strike First Amended Complaint Pursuant to C.C.P. § 425.16, Request for Judicial Notice, Notice of Lodging, and [Proposed] Orders filed concurrently]<br><br>**Hearing Date**: October 20, 2025<br>**Hearing Time**: 1:30 p.m.<br>**Courtroom**: 9B, 411 W. Fourth St. Santa Ana, CA 92701 |

TO THE HONORABLE COURT AND PLAINTIFF *PRO SE*:

PLEASE TAKE NOTICE that on October 20, 2025 at 1:30 p.m., or as soon thereafter as they may be heard, before the Honorable Mónica Ramírez Almadani, United States District Judge, in Courtroom 9B of the Ronald Reagan Federal Building and United States Courthouse located at 411 West 4th Street, Santa Ana, California 92701-4516, Defendants Paramount Global ("Paramount"), CBS Broadcasting Inc. ("CBS"), and Inside Edition Inc. ("Inside Edition") (collectively, "Defendants") will, and hereby do, move this Court for an order dismissing, with prejudice and without leave to amend, the Sixth Claim for Relief for alleged violation of the Americans with Disabilities Act, 42 U.S.C. § 12182, in the First Amended Complaint ("FAC" or "Dkt. 12") filed by Plaintiff Desirée Guerriere Townsend ("Plaintiff" or "Townsend").

Defendants bring this Motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the ground that the Sixth Claim for Relief fails to state a claim upon which relief may be granted under Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182 (the "ADA"). Specifically, Plaintiff has not, and cannot, properly allege an ADA claim against Defendants because: (i) it is clear from the face of the FAC that any such claim is time-barred; (ii) Defendants' broadcasts, press releases, and websites are not "places of public accommodation" under the ADA; (iii) Plaintiff has not alleged a nexus to a physical "place of public accommodation," as required under binding Ninth Circuit authority; and (iv) Plaintiff does not and cannot allege that she was treated differently on the basis of her disability.

Separately, Plaintiff's ADA claim against Defendants fails because it is barred by the First Amendment, which has long guaranteed "the exercise of editorial control and judgment," including "[t]he choice of material" to publish. *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974).

Plaintiff has identified no specific facts that would overcome these deficiencies. The ADA claim accordingly should be dismissed with prejudice and without leave to amend.

This Motion is based upon this Notice; the attached Memorandum of Points and Authorities; the concurrently filed Request for Judicial Notice with accompanying exhibits; all pleadings, records, and other documents on file with the Court in this action; and upon such oral argument as may be presented at the hearing of this Motion.

**This motion is made following a conference between counsel for Defendants and Plaintiff pursuant to Local Rule 7-3, which took place on July 22, 2025 by telephone wherein Defendants' counsel explained in detail the bases for the Motion, and Plaintiff declined to dismiss the sixth claim in the FAC**. *See* Hartmann Declaration.

Defendants respectfully request that this Court grant their Motion and dismiss Plaintiff's Sixth Claim with prejudice and without leave to amend.

Dated: September 12, 2025

JASSY VICK CAROLAN LLP

By: ___*/s/ Nicholas R. Hartmann*_____
Nicholas R. Hartmann

Counsel for Defendants
Paramount Global, CBS Broadcasting Inc., Inside Edition Inc.

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ........ 1

II. STATEMENT OF PERTINENT FACTS ........ 2

III. LEGAL STANDARD FOR MOTIONS TO DISMISS ........ 6

IV. PLAINTIFF FAILS TO STATE A CLAIM UNDER THE ADA ........ 6

- A. Plaintiff's ADA Claim is Time-Barred ........ 7
- B. The February 2010 Report is Not A "Place of Public Accommodation" and Plaintiff Cannot Allege She was Discriminated Against Based on Her Disability ........ 11
- C. Plaintiff's ADA Claim is Barred by the First Amendment ........ 15

V. CONCLUSION ........ 17

DECLARATION IN COMPLIANCE WITH L.R. 7-3 ........ 19

CERTIFICATION OF COMPLIANCE WITH L.R. 11-6.2 ........ 20

# TABLE OF AUTHORITIES

**Page(s)**

*Akhtar v. Mesa*,
698 F.3d 1202 (9th Cir. 2012) .......... 6

*Ariz. ex rel. Goddard v. Harkins Amusement Enters.*,
603 F.3d 666 (9th Cir. 2010) .......... 7, 11, 13, 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 6

*Associated Press v. United States*,
326 U.S. 1 (1945) .......... 15, 16

*Bailey v. Loggins*,
32 Cal. 3d 907 (1982) .......... 15, 16

*Bell Atl. Corp. v. Twombly*,
550 U.S. 554 (2007) .......... 6

*Branzburg v. Hayes*,
408 U.S. 665 (1972) .......... 15, 16

*Cullen v. Netflix, Inc.*,
880 F. Supp. 2d 1017 (N.D. Cal. 2012) .......... 13

*DiGiorgio Corp. v. Valley Labor Citizen*,
260 Cal. App. 2d 268 (1968) .......... 10

*Estate of Stern v. Tuscan Retreat, Inc.*,
725 F. App'x 518 (9th Cir. 2018) .......... 8

*Fox v. Ethicon Endo-Surgery, Inc.*,
35 Cal. 4th 797 (2005) .......... 8

*Kotev v. First Colony Life Ins. Co.*,
927 F. Supp. 1316 (C.D. Cal. 1996) .......... 9

*Langer v. Kiser*,
57 F.4th 1085 (9th Cir. 2023) .......... 11

*Long v. Walt Disney Co.*,
116 Cal. App. 4th 868 (2004) .......... 9

*Miami Herald Pub. Co. v. Tornillo*,
418 U.S. 241 (1974) .......... 15, 16, 17

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) .......... 15, 16

*NBC Universal Media, LLC v. Superior Ct.*,
225 Cal. App. 4th 1222 (2014)....................9

*Paterno v. Superior Ct.*,
163 Cal. App. 4th 1342 (2008).................... 15, 16

*Pittsburgh Press Co. v. Human Relations Comm'n*,
413 U.S. 376 (1973).................... 15, 16

*Rendon v. Valleycrest Prods., Ltd.*,
294 F.3d 1279 (11th Cir. 2002)....................14

*Riggs v. MySpace, Inc.*,
444 F. App'x 986 (9th Cir. 2011)....................10

*Roberts v. McAfee, Inc.*,
660 F.3d 1156 (9th Cir. 2011)....................10

*Robles v. Domino's Pizza, LLC*,
913 F.3d 898 (9th Cir. 2019).................... 12, 13

*Sharkey v. O'Neal*,
778 F.3d 767 (9th Cir. 2015)....................7

*Shively v. Bozanich*,
31 Cal. 4th 1230 (2003)....................9

*Somers v. Apple*,
729 F.3d 953 (9th Cir. 2013)....................6

*Sprewell v. Golden State Warriors*,
266 F.3d 979 (9th Cir. 2001).................... 6, 17

*Stern v. Sony Corp. of Am.*,
459 F. App'x 609 (9th Cir. 2011).................... 12, 13

*Stewart v. Rolling Stone LLC*,
181 Cal. App. 4th 664 (2010).................... 15, 16

*Swartz v. KPMG LLP*,
476 F.3d 756 (9th Cir. 2007)....................6

*Traditional Cat Assn., Inc. v. Gilbreath*,
118 Cal. App. 4th 392 (2004)....................10

*Treanor v. Washington Post Co.*,
826 F. Supp. 568 (D.D.C. 1993)....................16

*Wander v. Kaus*,
304 F.3d 856 (9th Cir. 2002)....................16

*Watanabe v. Home Depot USA, Inc.*,
No. 02-cv-05088, 2003 WL 24272650 (C.D. Cal. July 14, 2003)....................14

*Weyer v. Twentieth Century Fox Film Corp.*,
198 F.3d 1104 (9th Cir. 2000)........................................................ 11, 12, 13, 14

*Williams v. Owens-Illinois, Inc.*,
665 F.2d 918 (9th Cir. 1982)..................................................................................9

*Young v. Facebook, Inc.*,
790 F. Supp. 2d 1110 (N.D. Cal. 2011) ..........................................................13

**U.S. Constitution**

First Amendment ...................................................................... 2, 7, 15, 16, 18

**Federal Statutes**

42 U.S.C. § 12182..........................................................................................2
42 U.S.C. § 12182(a) .................................................................................. 6, 13
42 U.S.C. § 12182(b)(i)–(ii) ..........................................................................7
42 U.S.C. § 12182(b)(iii)...............................................................................7
47 U.S.C. § 230(c)(1) ....................................................................................10

**Federal Regulations**

28 C.F.R. § 36.104.........................................................................................12

**Federal Rules**

Fed. R. Civ. Proc. 12(b)(6) ...........................................................................6

**State Statutes**

Civil Code § 48a ..............................................................................................4
Civil Code § 3425.3 ..........................................................................................9
Code of Civil Procedure § 335.1 .....................................................................8
Code of Civil Procedure § 338(a).....................................................................8
Code of Civil Procedure § 425.16 ...............................................................2, 5

**Miscellaneous**

https://www.insideedition.com/159-flu-shot-woman..................................................4

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

In late 2009, Plaintiff attracted national fame by claiming that she developed a rare neurological disorder called "dystonia" ten days after getting a seasonal flu shot. She was the subject of multiple television broadcasts and interviews that included video footage of her exhibiting severe neurological symptoms. For instance, in October 2009, Plaintiff voluntarily demonstrated to *Inside Edition* journalists on camera how she exhibited severe muscle spasms when attempting to walk. Plaintiff then demonstrated to the same news crew how her spasms seemingly disappeared when walking backward or moving forward with a running gait. The peculiarity and severity of these symptoms, their apparent origin with a flu shot, and Plaintiff's willingness to discuss the matter understandably thrust Plaintiff into the national spotlight on the hotly debated topic of vaccine safety.

On February 4, 2010, just a few months after *Inside Edition*'s initial report on Plaintiff, an *Inside Edition* crew, doing a follow up report, observed Plaintiff walking and shopping in public without the difficulty she previously exhibited. When approached, Plaintiff denied that her symptoms were "psychogenic" or "a hoax." Defendants aired a follow-up segment that raised questions about Jennings' condition and its causes, quoted Jennings extensively, and ended by noting that Jennings showed Inside Edition a report "from a doctor who also believes her symptoms were vaccination-induced." *Inside Edition* did not republish the February 2010 Report.

This action arises out of that reporting from ***more than 15 years ago***. Excerpts from the *Inside Edition* segments regarding Plaintiff apparently have resurfaced on social media, not through any actions of Defendants, but via third party posts, perhaps due in part to Plaintiff's campaign to become Mayor of Los Angeles. Displeased with the resurgence of what she perceives to be unfair media coverage of her from 15 years ago, Plaintiff brought this action against Defendants. In addition to six state law claims based on defamation that are the subject of Defendants' concurrently filed

Special Motion to Strike pursuant to California Code of Civil Procedure section 425.16, Plaintiff alleges a single claim under the Americans with Disabilities Act ("ADA") based on the February 2010 *Inside Edition* segment. She brings the ADA claim under Title III, 42 U.S.C. § 12182, which mandates that disabled persons be granted equal access to "places of public accommodation" and related facilities and services. Plaintiff alleges that by airing the February 2010 segment, Defendants discriminated against her in providing a "public accommodation" because she is disabled; and that the ADA required Defendants to treat her "equally" by considering and conveying her "side" of the story in its news segment to her complete satisfaction.

Plaintiff does not—and cannot—state an ADA claim. Her ADA claim fails for multiple, independent reasons: (i) she waited too long to bring it; (ii) she has not—and cannot—allege any nexus between the *Inside Edition* February 4, 2010 segment and an actual, physical "place of public accommodation" to which she was denied equal access; (iii) she cannot show that Defendants treated her differently because of her disability; and (iv) her claim runs afoul of the First Amendment. These defects in the FAC cannot be cured. The Court should dismiss Plaintiff's ADA claim with prejudice.

## II. STATEMENT OF PERTINENT FACTS[1]

In October 2009, Plaintiff Desirée Townsend (then Desirée Jennings) was the subject of extensive national and local reporting in which she participated after claiming that she developed a rare neurological disorder after getting a flu vaccine. FAC ¶ 3, Ex. A. She appeared in multiple news broadcasts, including one in October 2009 by *Inside Edition*, with video footage "depicting the severity of her symptoms," FAC ¶ 37, Exs. A, 10–11, 24–26, which included muscle spasms and slurred speech,

[1] Defendants' statement of facts is nearly identical in both motions before the Court.

*id*. The broadcasts showed, among other things, that Plaintiff had great difficulty walking forward, but had little to no difficulty walking backward. *Id.*

Plaintiff alleges that "in or around January 2010" *Inside Edition* journalists filmed Plaintiff publicly engaging in activities of daily living, seemingly without any of the symptoms she previously exhibited. FAC ¶¶ 37, 43, Ex. A. When approached by *Inside Edition* journalists in a parking lot where she was filmed walking without obvious difficulty, Plaintiff asserted that she still suffered symptoms, and denied they were "psychogenic" or "a hoax." Exs. A, 1–2. Plaintiff alleges that "shortly after" the parking lot discussion, she met with *Inside Edition* journalists at her home, where she voluntarily provided them with "medical documentation" of her diagnosis and treatment. FAC ¶¶ 38.

In early February 2010, *Inside Edition* broadcast a follow-up report raising questions about Plaintiff's condition and showing what appeared to be dramatic improvement in Plaintiff's outward physical symptoms, depicting Plaintiff, for example, "walking normally, playing with her dogs, going shopping, and getting behind the wheel of a car and driving!" Exs. A, 1–2. It included Plaintiff's first-hand accounts, and ended by noting that Plaintiff provided a "report from a doctor who also believes her symptoms were vaccination-induced." *Id.* Plaintiff alleges that *Inside Edition*'s follow-up report "consisted of a press release, a written article hosted on a dedicated page of Defendants' website, and a video segment that originally aired as part of a television broadcast and was also made available on a dedicated webpage and distributed across Defendants' branded digital platforms" (together, the "February 2010 Report"). FAC ¶¶ 28, 42.[2]

Fifteen years later, on April 10, 2025, Plaintiff sent an e-mail asking for removal of "the press release published by your organization on February 4, 2010"

[2] Plaintiff makes clear, however, that the February 2010 Report did not appear on "social media platforms such as Instagram and TikTok" because those platforms "did not yet exist." *Id.* ¶ 47 (at 20) (NB: Plaintiff repeats paragraphs 43 to 49 in the FAC).

along with a specific link where the press release could be found. Ex. B at 60. Plaintiff's e-mail acknowledged that "this publication may fall outside the statute of limitations for legal action," but she was making the request "particularly as [she] prepare[s] to enter public service with a campaign for Mayor of Los Angeles." *Id.* An *Inside Edition* representative responded on April 14, standing by the accuracy of the report, but agreeing to remove the press release as a courtesy. Ex. B at 59–60.

In a follow-up e-mail, on April 15, Plaintiff pointed to third party posts on TikTok that, according to Plaintiff, "stem[] from the Inside Edition segment that aired in 2010." Ex. B at 58–59. Plaintiff's April 15 e-mail did not request that anything be taken down, but instead asked "Inside Edition or any other CBS affiliate" to do another report "revisiting" Plaintiff's story 15 years later. *Id.* The same *Inside Edition* representative responded on April 17 that the video Plaintiff referenced "does not appear on our digital platforms," and that, it is "unfortunate that you have been subjected to hateful comments, but we do not have the ability to police the behavior of people on online platforms [*e.g.*, TikTok] that we do not control." *Id.* at 57.

The following day, April 18, 2025, Plaintiff sent a letter purportedly pursuant to California Civil Code § 48a demanding retraction of "the *Inside Edition* segment published and broadcast by CBS Media Ventures on or about February 3, 2010," which "remains publicly accessible [at] https://www.insideedition.com/159-flu-shot-woman" (the "Retraction Demand"). Ex. C at 62. The letter acknowledged that "the accompanying video segment has long since been removed" from the webpage. *Id.* The Retraction Demand also insisted on a "correction" to explain Plaintiff's medical condition, and the "prompt filing of takedown requests" with third party platforms "such as Facebook, Instagram, TikTok, and YouTube" where, Plaintiff claimed, video of the February 2010 Report had been posted by third parties. *Id.* at 64. Counsel for Defendants responded in writing one week later explaining the decision not to issue a retraction. Ex. D.

More than 15 years after the February 2010 Report, and after Plaintiff started running for Mayor of Los Angeles, Plaintiff filed this lawsuit on May 7, 2025. Dkt. 1. Plaintiff filed her FAC on July 25, 2025. Dkt. 12. The FAC alleges seven claims against Defendants, all of which arise out of "the February 4, 2010 broadcast at the center of this case," FAC ¶ 50:

- defamation and defamation *per se* (First Claim, ¶¶ 78–84);
- false light invasion of privacy (Second Claim, ¶¶ 85–90);
- intentional infliction of emotional distress (Third Claim, ¶¶ 91–94);
- violation of California Civil Code § 3344 (Fourth Claim, ¶¶ 95–99);
- violations of the Unruh Civil Rights Act, California Civil Code § 51 (Fifth Claim, ¶¶ 100–07);
- violation of Title III of the ADA, 42 U.S.C. § 12182 (Sixth Claim, ¶¶ 108–16); and
- negligent supervision, hiring, and retention (Seventh Claim, ¶¶ 117–22)

Plaintiff's First through Fifth Claims and Seventh Claims are the subject of Defendants' concurrently filed Special Motion to Strike pursuant to California Code of Civil Procedure section 425.16. This motion to dismiss targets Plaintiff's Sixth Claim under Title III of the ADA.

As the basis for her ADA claim, Plaintiff alleges that the February 2010 Report "denied [her] the full and equal enjoyment of their media services by refusing to consider, acknowledge, or incorporate her medically documented disability, even when directly presented with verified records." FAC ¶ 35. Defendants' alleged failure to portray Plaintiff's side of the story as part of the February 2010 Report constituted, according to Plaintiff, a "refusal to act" that "amounted to a denial of reasonable accommodation under Title III of the ADA in the equal representation,

medical credibility, and dignified treatment to which disabled individuals are entitled." *Id.* ¶ 36. Plaintiff's allegations emphasize that her ADA claim is based on "deliberate editorial choices," which she contends "materially interfered with [her] access to public life, medical treatment, and societal inclusion, harms that nondisabled individuals do not face under similar circumstances." *Id.*

On the basis of this and her other claims, Plaintiff alleges that she has suffered "total damages in the amount $100,000,000." FAC, Prayer ¶ 1.

## III. LEGAL STANDARD FOR MOTIONS TO DISMISS

Claims should be dismissed at the outset of a case under Federal Rule of Civil Procedure 12(b)(6) if a plaintiff fails to plausibly allege a cognizable legal theory or sufficient facts to support that theory. *Somers v. Apple*, 729 F.3d 953, 959 (9th Cir. 2013); *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Plausibility requires pleading facts, as opposed to conclusory allegations or the 'formulaic recitation of the elements of a cause of action.'" *Somers*, 729 F.3d at 959–60 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)). At the motion to dismiss stage, a court may disregard unsupported conclusions and unreasonable inferences meant merely to plead facts consistent with a theory of defendant's liability. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

Although courts typically "consider only allegations contained in the pleadings" at the motion to dismiss stage, they also may consider "exhibits attached to the complaint, and matters properly subject to judicial notice." *Akhtar v. Mesa*, 698 F.3d 1202, 1212 (9th Cir. 2012) (citing *Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir. 2007) (per curiam)).

## IV. PLAINTIFF FAILS TO STATE A CLAIM UNDER THE ADA

Title III of the ADA prohibits discrimination on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a). Discrimination occurs when disabled individuals are denied the opportunity, or

provided unequal opportunities, to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of a "place of public accommodation" on the basis of their disability. *Id.* § 12182(b)(i)–(ii). Different or separate provisions for disabled individuals are permissible so long as they are "as effective as that provided to others." *Id.* § 12182(b)(iii).

In order to prevail on a discrimination claim under Title III of the ADA, a plaintiff must show that: (1) the plaintiff is disabled within the meaning of the ADA;[3] (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied public accommodations by the defendant because of her disability. *Ariz. ex rel. Goddard v. Harkins Amusement Enters.*, 603 F.3d 666, 670 (9th Cir. 2010) ("*Goddard*").

Here, Plaintiff fails to plead—and cannot plead—the elements of an ADA claim because: (i) any such claim is time-barred; (ii) *Inside Edition*'s broadcast, press release, and webpage composing the February 2010 Report are not "places of public accommodation" under the ADA; and (iii) Plaintiff cannot allege that she was discriminated against on the basis of her disability, and (iv) Plaintiff's claim is barred by the First Amendment. These incurable defects are addressed in turn below.

**A. Plaintiff's ADA Claim is Time-Barred**

Title III of the ADA does not provide an express statute of limitations. *Sharkey v. O'Neal*, 778 F.3d 767, 770 (9th Cir. 2015). Where Congress is silent on limitation periods for federal claims, courts "borrow the statute of limitations applicable to the most analogous state-law claim, so long as 'it is not inconsistent with federal law or policy to do so.'" *Id.* The Ninth Circuit has not explicitly ruled which California statute provides the appropriate limitations period, but it recently observed that "the only conceivable options are California's two-year personal injury

[3] For purposes of this Motion only, Defendants accept as true that Plaintiff qualifies as "disabled" within the meaning of the ADA.

provision and its three-year period for an action upon a liability created by statute." *See Estate of Stern v. Tuscan Retreat, Inc.*, 725 F. App'x 518, 526 (9th Cir. 2018) (citing Cal. Civ. Proc. Code §§ 335.1, 338(a)). Under California law, "a cause of action accrues at the time when the cause of action is complete with all of its elements." *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 806 (2005) (quotations omitted). "Because 'the last element to occur is generally, as a practical matter, the injury to the future plaintiff,' the statute of limitations typically begins to run on the date of the plaintiff's injury." *Id.*

Regardless of whether the Court applies a two- or three-year limitations period, Plaintiff's ADA claim is time-barred based on the facts alleged in the FAC. Plaintiff's ADA claim is based on publication of the "Inside Edition segment," which was published in February 2010. *See* FAC ¶ 112; *see also id.* ¶¶ 38–39, Ex. C at 62. And Plaintiff repeatedly acknowledges that Defendants published the component parts of the February 2010 Report in 2010. *See, e.g.*, FAC ¶ 27 ("broadcast" and "2010 segment aired by Inside Edition" has allegedly harmed Plaintiff "[f]or nearly twenty years"), ¶ 49 (accusing Defendants of "16 years of public abuse"), ¶ 50 ("the February 4, 2010 broadcast [is] at the center of this case") (emphasis removed). Plaintiff's FAC ¶ 84 copies text from Exhibit A to the FAC, at 49, both of which show under the byline that the report was "First Published: 4:00 PM PST, February 3, 2010," and "Updated: 12:00 AM PST, February 4, 2010." Each of the subsequent state law claims refers back to the same publication and its allegedly "false" and "defamatory" contents, *see* FAC ¶¶ 83–84, 86, 92, 97, 104, 118–19, as does the ADA claim, *id.* ¶ 112. In her April 10, 2025 e-mail attached as Exhibit B to the FAC, Plaintiff acknowledged that the accompanying press release was "published" on "February 4, 2010," and further acknowledged that "this publication may fall outside the statute of limitations for legal action." Ex. B at 60. Even assuming the longer, three-year limitations period applies, Plaintiff's claim expired on February 4, 2013—*i.e.*, more than a decade before she brought this action.

Plaintiff's conclusory allegations of "ongoing" harm do not change the analysis. *See* FAC ¶¶ 5, 9, 30, 47, 82, 121. In the Ninth Circuit, "[a] continuing violation should be distinguished from the continuing impact of a past, yet discrete and no longer existent discriminatory act." *Williams v. Owens-Illinois, Inc.*, 665 F.2d 918, 925 n.3 (9th Cir. 1982), *modified on denial of reh'g*, 1982 WL 308873 (9th Cir. June 11, 1982). For example, an employer's ongoing and discriminatory denial of a promotion is a continuing violation, but a discriminatory termination or refusal to hire is a discrete act. *See id.* at 924; *accord, e.g.*, *Kotev v. First Colony Life Ins. Co.*, 927 F. Supp. 1316, 1320 (C.D. Cal. 1996) (applying *Williams*' holding to Title III claims under the ADA and concluding past discrete acts were barred by the statute of limitations, notwithstanding the plaintiff's allegations of ongoing harm).

Here, Plaintiff's allegations of ongoing harm concern the continuing impact of a past, yet discrete and no longer existent discriminatory act—namely, publication of the February 2010 Report. FAC ¶¶ 112–13. Indeed, Plaintiff's own allegations refer to the "February 4, 2010 broadcast [as] the center of this case." *Id.* ¶ 50 (emphasis removed). Moreover, under the single publication rule, Civil Code § 3425.3, tort claims accrue when the underlying material is *first* publicly disseminated, *Long v. Walt Disney Co.*, 116 Cal. App. 4th 868, 870, 874 (2004), "*regardless* of when the plaintiff secured a copy or became aware of the publication," *Shively v. Bozanich*, 31 Cal. 4th 1230, 1245–46 (2003) (original emphasis).[4] As a result, "courts uniformly have *rejected* the application of the discovery rule" to claims subject to the single publication rule because "application of the discovery rule would undermine the protection provided by the single-publication rule." *Id.* at 1250 (original emphasis). Courts likewise reject the proposition that a "cause of action arose continuously"

[4] California courts also apply the principle embodied by the single publication rule to non-tort claims if such claims are premised on a defendant's public dissemination of an expressive work. *See, e.g.*, *NBC Universal Media, LLC v. Superior Ct.*, 225 Cal. App. 4th 1222, 1234–35 (2014).

because it was on the internet. *Traditional Cat Assn., Inc. v. Gilbreath*, 118 Cal. App. 4th 392, 397–405 (2004); *accord Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1169 (9th Cir. 2011) (same).

There is no allegation that Defendants *actually* altered or republished the February 2010 Report in the past 15 years. *See generally* FAC.[5] The FAC suggests that the *removal* of aspects of the February 2010 Report (the video and press release) from webpages (which Plaintiff requested), FAC ¶¶ 47–48, 51–54, Ex. B, constituted an alteration that restarted the statute of limitations, *id.* ¶ 54. There is no legal support for Plaintiff's novel theory, and it would run contrary to Ninth Circuit authority interpreting the ADA, as well as the single publication rule, and the rulings in *Roberts* and *Traditional Cat* holding that *maintaining* material on a website does *not* constitute republication or toll the statute of limitations.[6]

Nor is there any support for Plaintiff's novel legal theory that Defendants' purported "continued allowance" of alleged *third party infringements* of copyrighted material restarted the statute of limitations for Defendants' publications. FAC ¶ 53, Ex. C. To hold otherwise would subject any publishing defendant to continuing liability for internet publications—contrary to Ninth Circuit authority interpreting the ADA, and *Roberts* and *Traditional Cat*—*as well as* renewed liability even where a republication is made by a third party without permission. *Cf. DiGiorgio Corp. v. Valley Labor Citizen*, 260 Cal. App. 2d 268, 274 (1968) (republication by a third party does not restart the time to demand a retraction from original publisher).[7]

[5] To be clear, Defendants did not alter or republish the February 2010 Report in the past 15 years, and any allegation to the contrary would violate Rule 11.

[6] It would also run afoul of 47 U.S.C. § 230(c)(1), which bars claims based on the decision to remove content from a website. *See, e.g.*, *Riggs v. MySpace, Inc.*, 444 F. App'x 986, 987 (9th Cir. 2011).

[7] That is especially true here because Plaintiff concedes that the platforms on which the third parties are allegedly publishing (Instagram and TikTok) *did not exist* at the time the February 2010 Report was published, FAC ¶ 47 (at 20).

Plaintiff fails to plausibly allege any set of facts under which her ADA claim is timely, and the ADA claim accordingly should be dismissed on statute of limitations grounds.

**B. The February 2010 Report is Not A "Place of Public Accommodation" and Plaintiff Cannot Allege She was Discriminated Against Based on Her Disability**

Plaintiff's allegations fail to state a claim under the ADA for at least three reasons.

***First***, *Inside Edition's* broadcasts, press releases, and webpages composing the February 2010 Report are not a "place of public accommodation" under the ADA. *See Harkins Amusement Enters.*, 603 F.3d at 670 (second element of an ADA claim). Under controlling Ninth Circuit authority, "places of public accommodation" are limited to actual physical spaces. *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104, 1114 (9th Cir. 2000); *accord Langer v. Kiser*, 57 F.4th 1085, 1100 (9th Cir. 2023) (reaffirming *Weyer*'s holding), *cert. denied*, 144 S. Ct. 823 (2024), *reh'g denied*, 144 S. Ct. 1132 (2024).

In *Weyer*, the plaintiff alleged that an insurance company that administered an allegedly discriminatory employer-provided insurance policy was a covered "place of public accommodation." 198 F.3d at 1113–14. The court rejected that argument, holding that because the ADA covers only "actual, physical places where goods or services are open to the public, and places where the public gets those goods or services," there had to be "some connection between the good or service complained of and an actual physical place." *Id.* at 1114. Thus, although the defendant insurance company had a physical office, the insurance policy at issue did not concern accessibility, *i.e.*, "such matters as ramps and elevators so that disabled people can

get to the office." *Id.* The employer-provided policy was not a "good" offered by the insurance company's physical office. *Id.* at 1115.[8]

Here, Plaintiff alleges that Defendants "own and operate commercial media outlets that are open to the public and constitute 'places of public accommodation.'" FAC ¶ 110. Even if that were so, there is no allegation or rational argument that Plaintiff was denied access or discriminated against as to any "actual physical place" owned or operated by any of the Defendants. As in *Weyer*, Plaintiff's ADA claim necessarily fails because the February 2010 Report on which her claim is based is not an "actual physical place."

***Second***, Plaintiff cannot allege a plausible nexus between the February 2010 Report and an "actual physical place" to which she was denied equal access on the basis of her disability. *Id.* at 1114 (emphasis added). The Ninth Circuit's holding in *Robles v. Domino's Pizza, LLC*, is instructive. 913 F.3d 898 (9th Cir. 2019). In *Robles*, the plaintiff alleged that Domino's website and app were not equally accessible to the blind. *Id.* at 902–03. The Ninth Circuit held that a sufficient nexus to a physical "place of public accommodation" existed to assert an ADA claim because

> Domino's website and app facilitate access to the goods and services of a place of public accommodation—Domino's physical restaurants. They are two of the primary (and heavily advertised) means of ordering Domino's products to be picked up at or delivered from Domino's restaurants. . . . The ADA applies to Domino's website and app, which connect customers to the goods and services of Domino's physical restaurants.

[8] *See also Stern v. Sony Corp. of Am.*, 459 F. App'x 609, 610 (9th Cir. 2011) (noting that the ADA's implementing regulations, 28 C.F.R. § 36.104, clarify that a "place" is "'a facility operated by a private entity,' and defines 'facility' to mean 'all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located.'").

*Id.* at 905–06. In reaching that conclusion, the Ninth Circuit emphasized that the "nexus between Domino's website and app and physical restaurants . . . is ***critical*** to our analysis." *Id.* at 905 (emphasis added).

Unlike the pizza-ordering website and app in *Robles*, *Inside Edition*'s broadcasts, press releases, and webpages were editorial publications with no nexus to a physical space. At no point did those publications "facilitate access" to any physical space, let alone a space comparable to restaurant. *Id.* at 905–06. Nor did the publications "connect customers to" to the goods and services offered at a physical space, let alone goods or services comparable to pizza delivery. *Id.* Plaintiff accordingly cannot allege any cognizable theory under which she was denied equal access to a physical "place of public accommodation" with some nexus to the February 2010 Report, which is fatal to her ADA claim. *Accord, e.g.*, *Young v. Facebook, Inc.*, 790 F. Supp. 2d 1110, 1115–16 (N.D. Cal. 2011) (Facebook's social media service, to which the plaintiff allegedly was denied equal access, had no nexus to a physical place even though Facebook gift cards are sold at places of public accommodation); *Cullen v. Netflix, Inc.*, 880 F. Supp. 2d 1017, 1024 (N.D. Cal. 2012) (Netflix's online streaming video library is a website, not an "actual physical place" necessary to qualify as a "place of public accommodation" under *Weyer*); *Stern*, 459 F. App'x at 610–11 (Sony video game was not a "place of public accommodation," even though Sony operates physical retail stores, because there was no alleged nexus between the stores and the alleged inaccessibility of the game).

***Third***, Plaintiff's ADA claim fails because she has not alleged that she was "discriminated" against *because of* her disability. *See Harkins Amusement Enters.*, 603 F.3d at 670 (third element of an ADA claim). Under the ADA, "[n]o individual shall be discriminated against *on the basis of disability* in the full and *equal* enjoyment of the goods, services, facilities, privileges, advantages, or accommodations. . . . ." 42 U.S.C. § 12182(a) (emphases added). "[T]here is no discrimination under the Act where disabled individuals are given the same

opportunity as everyone else." *Weyer*, 198 F.3d at 1116 (9th Cir. 2000); *accord Goddard*, 603 F.3d at 671 ("[T]he ADA 'does not require provision of different goods or services, just nondiscriminatory enjoyment of those that are provided.'") (quoting *Weyer*, 198 F.3d at 1115).

In *Watanabe v. Home Depot USA, Inc.*, for example, the plaintiff claimed that Home Depot violated the ADA by blocking the aisles of its warehouse store with large pallets. No. 02-cv-05088, 2003 WL 24272650, at *3 (C.D. Cal. July 14, 2003). The court denied the plaintiff's motion for summary judgment on the ADA claim because plaintiff did "not claim that his access to Store merchandise was any more obstructed due to his disability than that of other customers or employees." *Id.* Consequently, the court held that "the temporary blocking of shelves is not discriminatory or in violation of the ADA, as the blocking preclude[d] *everyone's* access." *Id.* (record citations omitted; emphasis added).

Here, as in *Watanabe*, Plaintiff's ADA claim fails because she does not allege she was denied opportunities or access given to others without disabilities. If anything, the *opposite* inference is more reasonably drawn from Plaintiff's allegation that *Inside Edition* journalists "accompanied Plaintiff to her home" to hear her out. *See* FAC ¶ 38. There is no allegation—nor could there be any plausible allegation—that *anyone else* can control the content of Defendants' publications and that somehow Plaintiff was treated differently because of her disability. Indeed, it is not clear from the FAC what Plaintiff believes an "equal" opportunity to access Defendants' content could possibly look like.[9]

[9] This case thus can be distinguished from *Rendon v. Valleycrest Prods., Ltd.*, where ADA plaintiffs alleged that the *Millionaire* television gameshow's "fast finger" telephonic screening process denied them equal opportunity to compete and appear on television *because of* their disabilities. 294 F.3d 1279, 1283 (11th Cir. 2002).

### C. Plaintiff's ADA Claim is Barred by the First Amendment

Plaintiff's ADA claim also fails because it is barred by the First Amendment, which has long guaranteed "the exercise of editorial control and judgment," including "[t]he choice of material" to publish. *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (holding that newspapers have a First Amendment right *not* to publish material).[10] The Supreme Court recently surveyed decades of precedent on this bedrock principle of First Amendment rights, starting with *Tornillo*, and observed:

> We have repeatedly faced the question whether ordering a party to provide a forum for someone else's views implicates the First Amendment. And we have repeatedly held that it does so if, though only if, the regulated party is engaged in its own expressive activity, which the mandated access would alter or disrupt.

*Moody v. NetChoice, LLC*, 603 U.S. 707, 728 (2024) (collecting and summarizing cases).[11] *Moody* thus reaffirmed that the First Amendment protects publishers like Defendants—which indisputably are "engaged in [their] own expressive activity"—from being forced to serve as a forum for others' views.

Here, Plaintiff asserts that the ADA requires Defendants to "consider, acknowledge, or incorporate her medically documented disability" into its

---

[10] *See also Associated Press v. United States*, 326 U.S. 1, 20 n.18 (1945) (district court did "not compel AP or its members to permit publication of anything which their 'reason' tells them should not be published"); *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972) (emphasizing that cases before the court "involve[d] . . . no express or implied command that the press publish what it prefers to withhold"); *Pittsburgh Press Co. v. Human Relations Comm'n*, 413 U.S. 376, 391 (1973) ("we reaffirm unequivocally the protection afforded to editorial judgment").

[11] The California Supreme Court likewise recognizes publishers' "*total control* over the content" they publish. *Bailey v. Loggins*, 32 Cal. 3d 907, 918–19 (1982) (emphasis added); *Stewart v. Rolling Stone LLC*, 181 Cal. App. 4th 664, 690–91 (2010) (holding First Amendment-based right to "choose what to print and what not to" barred claims related to defendant's advertising and layout choices, including claims brought under California's Unfair Competition Law); *Paterno v. Superior Ct.*, 163 Cal. App. 4th 1342, 1352-55 (2008) (publisher had no obligation to include what plaintiff considered to be "key facts" or "context" in its reporting).

programming and, presumably, to convey her view of the facts.[12] FAC ¶ 35. This is exactly the sort of imposition on editorial judgment that is prohibited by the First Amendment and analogous state law as recognized in *Tornillo*, *Moody*, *Associated Press*, *Branzburg*, *Pittsburgh Press*, *Bailey*, *Stewart*, and *Paterno*. Indeed, Plaintiff's own allegations repeatedly admit that her ADA claim is based on Defendants' exercise of editorial discretion. *See* FAC ¶ 43 (choice not to air Plaintiff's version of events was "a calculated editorial decision"); *id.* ¶ 36 (ADA claim is based on "Paramount's deliberate editorial choices"). *Tornillo* recognized that "[t]he choice of material to go into a [broadcast] . . . constitute[s] the exercise of editorial control and judgment," which is protected by the First Amendment. 418 U.S. at 258.

Courts faced with Plaintiff's argument have followed *Tornillo*'s admonition and declined to interpret the ADA in a manner that would run afoul of protections for a free press and free speech. In *Treanor v. Washington Post Co.*, the plaintiff was the author of a book on the history of civil rights for disabled people. 826 F. Supp. 568, 569 (D.D.C. 1993). Plaintiff filed suit against the *Washington Post*, alleging that it had "published reviews of similar books by non-disabled authors," such that its "refusal to review the Plaintiff's book constitutes discrimination in violation of the ADA." *Id.* The court rejected Plaintiff's argument that the term "public accommodations" in Title III of the ADA encompasses news reporting, in part to "avoid[] the potential constitutional difficulties the ADA might encounter if its provisions were interpreted to require newspapers to publish certain reviews, articles, or columns." *Id.* Citing *Tornillo*, the court observed that such "[g]overnmental intrusion into the editorial process is clearly a violation of the First Amendment freedom of the press." *Id.* at 569–70. "There is a fundamental difference between

---

[12] This result presumably would be achieved via injunction, which Plaintiff explicitly requests as relief for her ADA claim. *See* FAC ¶ 116. Further, "[d]amages are not recoverable under Title III of the ADA—only injunctive relief is available for violations of Title III." *Wander v. Kaus*, 304 F.3d 856, 858 (9th Cir. 2002).

having access to the neighborhood grocery store and asserting a so-called right to have a book reviewed by a newspaper." *Id.* at 569.

The same holds true here. Plaintiff's ADA claim arises from her disappointment with the content of the February 2010 Report. *See, e.g.*, FAC ¶¶ 35–36, 112–13. But under *Tornillo* and its progeny, Defendants cannot be forced to broadcast or publish Plaintiff's preferred narrative, and they are free to exercise editorial discretion when it comes to what information to consider publishing, to publish, or not to publish to their audience.

Notably, Plaintiff's interpretation of the ADA—which no court has adopted—would lead to absurd results. Broadcasters and journalists alike would be required to modify their newsgathering and the content of their reporting as to ***any*** individual claiming to have a "disability" as defined in the ADA, at the individual's request, whenever that individual perceives reporting to be (or even speculates that it *might be*) in some way "demeaning." *See* FAC ¶ 113 (alleging ADA claim arises from "Defendants' use[] [of] their platform to marginalize and demean Plaintiff on the basis of her disability."). That interpretation of the ADA would interfere with Defendants' constitutional rights, as well as the rights of all other journalists and broadcasters.

Accordingly, Plaintiff's ADA claim is not—and cannot possibly be—stated in a fashion consistent with the guarantees of freedom of the press and freedom of speech.

## V. CONCLUSION

Dismissal of Plaintiff's claims is warranted for the reasons set forth in Section IV, *supra*. In addition, that dismissal should be with prejudice because it is "beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief." *Sprewell*, 266 F.3d at 988. Plaintiff's ADA claim is based on—to use her words—"**the February 4, 2010 broadcast at the center of this case**." FAC ¶¶ 50, 112–13 (emphasis in original). No amendment can cure the fact

that the broadcast aired more than 15 years ago, well outside the limitations period. No amendment can cure the fact that the broadcast is not (and has no nexus to) a "place of public accommodation" under Title III of the ADA. No amendment can cure the fact that Plaintiff received the same access to *Inside Edition*'s editorial decision making as non-disabled people—*i.e.*, none. No amendment can cure the fact that Defendants' editorial decision making is protected by the First Amendment.

The Court should dismiss Plaintiff's ADA claim with prejudice.

Dated: September 12, 2025

JASSY VICK CAROLAN LLP

By: *___/s/ Nicholas R. Hartmann__*
Nicholas R. Hartmann

Counsel for Defendants
Paramount Global, CBS Broadcasting Inc., Inside Edition Inc.

**DECLARATION IN COMPLIANCE WITH L.R. 7-3**

I declare that on July 22, 2025, counsel for Defendants and Plaintiff conferred for approximately 30 minutes by telephone to discuss the issues and positions raised in this Motion and attempted in good faith to resolve the Motion in whole or in part. Although the First Amended Complaint ("FAC") had not yet been filed, Plaintiff shared a draft of the FAC with Defendants' counsel on July 20, 2025 in advance of the July 22, 2025 teleconference. Plaintiff filed and formally served her FAC on July 25, 2025. Plaintiff declined to dismiss any of her state law claims on the July 22, 2025 call, proceeded to file her FAC with the new seventh claim, and did not withdraw or dismiss any part of her FAC in response to Defendants' counsel's communications. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: September 12, 2025

*/s/ Nicholas R. Hartmann*
Nicholas R. Hartmann

Counsel for Defendants
Paramount Global, CBS Broadcasting Inc., Inside Edition Inc.

**CERTIFICATION OF COMPLIANCE WITH L.R. 11-6.2**

The undersigned, counsel of record for Defendants Paramount Global, CBS Broadcasting Inc., and Inside Edition Inc., certifies that the foregoing memorandum of points and authorities contains 5,831 words (excluding the caption, table of contents, table of authorities, signature block, the certification of compliance with L.R. 7-3, and this certification), which complies with the word limit of L.R. 11-6.1.

Dated: September 12, 2025

*/s/ Nicholas R. Hartmann*
Nicholas R. Hartmann

Counsel for Defendants
Paramount Global, CBS Broadcasting Inc., Inside Edition Inc.