Desirée Townsend
2901 Ocean Park Blvd., Suite 201
Santa Monica, CA 90405
desiree@sparktrademarks.com
PLAINTIFF IN *PRO SE*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

DESIREE GUERRIERE TOWNSEND, an individual,

Plaintiff,

v.

PARAMOUNT GLOBAL, a Delaware corporation; CBS BROADCASTING INC., a New York corporation; and INSIDE EDITION INC., a New York corporation,

Defendants.

Case No. 2:25-cv-04077-MRA-DFM

Honorable Mónica Ramírez Almadani

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE**

[Plaintiff's Opposition to Defendants' Motion to Dismiss Sixth Claim for Relief and Request for Judicial Notice, and [Proposed] Order]

**Date:** **October 27, 2025**
**Time:** **1:30 p.m.**
**Courtroom:** **9B, 411 West 4th St.**
**Santa Ana, CA 92701**

# TABLE OF CONTENTS

I. INTRODUCTION ........ 3
II. FACTUAL BACKGROUND ........ 3
III. STANDARD ON REPUBLICATION AND ACCRUAL (CALIFORNIA SINGLE-PUBLICATION RULE) ........ 7
IV. ARGUMENT ........ 8
V. POINT I ........ 8
A. Defendants' Statements Are Not Protected Activity Because They Convey Falsehoods by Implication and Omission ........ 8
B. Defendants' Defamatory Statements Are Not In The Public Interest ........ 10
VI. POINT II ........ 11
A. Plaintiff's Claim Has Minimal Merit ........ 11
B. Plaintiff's Stated Claim For Defamation And Proof Of Malice ........ 12
C. Plaintiff Is Not A Public Figure Or Limited-Purpose Public Figure ........ 15
D. Judicial Notice of the Vaccine Court Decision Does Not Establish the Truth of Its Findings ........ 17
VII. PLAINTIFF'S OBJECTIONS TO DEFENDANTS' IMPROPER REQUEST FOR JUDICIAL NOTICE ........ 18
VIII. CONCLUSION ........ 19

## I. INTRODUCTION

The Defendants' publication of a television broadcast that originally aired on February 4, 2010, was later made available on a dedicated webpage featuring a video segment, an accompanying article, and a separately issued press release. Both the press release and the video segment have since been removed from Defendants' own websites and platforms. However, the video segment continues to circulate, having been authorized for distribution by third-party news organizations and a television host on his social media account. Plaintiff remains unaware of the dates on which these materials were published on Defendants' platforms or websites, information that cannot be ascertained without discovery, but is aware that the segment was subsequently published on social media on June 19, 2024, and again on April 4 and 5, 2025.

Under the single-publication rule, the questions before this Court include how each of these distinct publications should be treated for purposes of determining whether any act of republication restarted the statute of limitations, and whether the delayed discovery rule applies where Plaintiff neither knew of, nor could have reasonably discovered, the existence or timing of these publications due to Defendants' concealment of relevant facts.

If any of the aforementioned publications qualify as republications under the law, or if discovery establishes that the statute of limitations was in fact restarted, a further question arises: whether the editorial framing of the broadcast, article, and/or press release — which has led the public to overwhelmingly label Plaintiff as having perpetrated a "hoax" or as being a "faker" or "fraud" — constitutes actionable defamation.

## II. FACTUAL BACKGROUND

On or about June 19, 2024, NBCUniversal's *Access Hollywood* host Mario Lopez published Defendants' *Inside Edition* segment (the "Segment") featuring Plaintiff (then known as Desirée Jennings) from February 4, 2010. (FAC Pg. 21, ¶ 43). At the time,

Lopez shared the Defendants' video clip with his 3.2 million followers, captioning it: "There's gotta be some kind of award for this performance… #MethodActor #OscarWorthy." *Id*. On or about April 4 and 5, 2025, less than a month after Plaintiff commented on Lopez's post, two TikTok accounts, @lightlyseasonedmike and @didyoucatchthis, republished the same *Inside Edition* segment as Lopez, reaching an audience of millions of viewers on TikTok. At the time the Segment originally aired in February of 2010, TikTok and Instagram did not yet exist. (FAC Pg. 21, ¶¶ 44–47).

The video segment originated from Paramount Global's copyright-protected digital platforms, but was subsequently removed. (FAC ¶ 50). An audio clip of the segment was later used by NBC News in its podcast *Truthers: Tiffany Dover is Dead** in an episode titled "The Playbook," released on May 11, 2022. (Hartman Declaration Ex. 42). On or about August 4, 2023, NBC News again featured clips from the same Segment about Plaintiff, reusing footage similar to that which appeared on Lopez's account. (FAC ¶ 55; Hartman Decl. Ex. 44; Townsend Decl. ¶ 15).

On or about April 10, 2025, Plaintiff searched her former name online in an effort to trace the source of the resurfaced broadcast through TikTok and discovered an accompanying press release (FAC at 23 ¶ 46). That same day, she emailed three employees affiliated with the public relations teams at CBS, Paramount, and ViacomCBS, detailing her disability diagnosis and requesting a reasonable accommodation — specifically, the removal of the press release — due to the ongoing harm it was causing (FAC at 23 ¶ 47; Ex. B). On April 14, 2025, Bettina Cataldi, Senior Manager of Publicity for CBS, responded and confirmed that the press release had been removed (FAC at 23 ¶ 48; Ex. B).

However, the removal did not stop the hateful online commentary directed at Plaintiff. As a result, she submitted a second accommodation request on April 16, 2025, this time seeking to be connected with a member of the production team to correct or update the broadcast with accurate medical information (FAC at 23 ¶ 49). Plaintiff

explained that a medical record from her treating physician at the time had been provided to the Inside Edition production team, yet they instead relied on a third-party report from the CDC. (FAC Pg. 23, ¶¶ 47, 49; Townsend Decl. Ex. 1; Hackett Decl. Ex. 1). That request for accommodations was denied.

On or about April 17, 2025, Ms. Cataldi responded, stating: “This video does not appear on our digital platforms. It is unfortunate that you have been subjected to hateful comments, but we do not have the ability to police the behavior of people on online platforms we do not control.” (FAC ¶ 50; Townsend Decl. Ex. 1; Hackett Decl. Ex. 1).

On April 18, 2025, Plaintiff timely delivered a retraction demand pursuant to California Civil Code § 48a(a), requesting that Defendants issue a retraction in light of the republication of the Segment through two TikTok accounts on April 4 and 5, 2025, which republished the same video published to Mario Lopez’s Instagram account on June 19, 2024. Service of the demand letter was effective and Defendants acknowledged the letter and formally declined the request, characterizing Plaintiff’s submission of her medical record as merely “talking points,” “key facts,” or “context” that Inside Edition was under no obligation to report. (FAC ¶ 32; Ex. C).

Plaintiff’s story initially received brief local coverage in the Washington, D.C. area in mid-October 2009 by WUSA9, Fox 5 News DC, NBC 4 Washington, and the *Loudoun Times-Mirror*, relating to the onset of her symptoms, which at the time were believed to have been caused by a flu vaccine. (Hartman Decl. Exs. 3–8). *Inside Edition* subsequently aired two broadcasts and published accompanying articles detailing Plaintiff’s symptoms and disability, titled “Woman Says Flu Shot Triggered Rare Neurological Disorder,” which aired on October 16, 2009, and “Desiree Jennings’s Story Causes Flu Shot Controversy,” which aired on October 23, 2009. (Hartman Decl. Exs. 10 and 11). Both webpages hosting these articles, and any potential corresponding video segments, were removed at some point prior to 2014. (Townsend Decl. Exs. 7 and 8).

Local media coverage appears to have ceased after November 5, 2009, following a

report by WCNC News Channel 36 (Hartman Decl. Exs. 12–21). Nearly three months passed without additional reporting until the February 4, 2010, broadcast of *Inside Edition*. In the Segment, correspondent Les Trent posed the question to viewers: "Did Desiree Jennings really suffer a one-in-a-million reaction to the seasonal flu shot as she says, or is it all some kind of an elaborate hoax, or is it something else entirely?" The program then cut to a CDC report referencing an unnamed admitting neurologist at an unidentified hospital, as the word "psychogenic" flashed on screen. The segment concluded with anchor Deborah Norville stating that "she did show us a report from her current doctor who believes her symptoms were vaccination induced." (FAC ¶¶ 39–41; Hackett Decl. Ex. 1).

Media coverage regarding Plaintiff in 2010 continued in the months following the February 4, 2010 segment and included an interview on PBS on March 22, 2010, titled "Dr. Anthony Fauci: Risks From Vaccines Are 'Almost Nonmeasurable,'" and a 20/20 segment on July 22, 2010, titled "Medical Mystery or Hoax: Did Cheerleader Fake a Muscle Disorder?" (Hartman Decl. Exs. 34 and 39). Coverage continued sporadically over the years, including an article titled "There Is No 'Alternative Medicine'" published in October 2014, "How Fake Medical News Is SERIOUSLY Damaging Our Health…" on November 24, 2018, and a podcast episode released on September 23, 2022, titled "The Ballad of Desiree Jennings," which described Plaintiff as "the woman who inspired a bunch of memes." (Hartman Decl. Exs. 37, 40 and 43).

Plaintiff was deemed legally disabled on February 6, 2012, after a long and careful review process conducted by the Social Security Administration with a disability onset date of September 17, 2009. (Townsend Decl. ¶5, Ex. 2). Plaintiff was diagnosed with autonomic dysfunction and deemed disabled on that basis. (Hartmann Decl. Ex. 41, at 16, 34, 51). She has received disability-related services that enable her to participate in public life, including attending Saddleback College. *Id*. In October of 2009, Inside Edition filmed two productions with Plaintiff "depicting her muscle spasms and slurred speech,

and how she could walk backward—but not forward—normally." (Defendants Special Motion to Strike, ECF 14; Hartman Decl. Exs. 10, 11). Plaintiff was granted reasonable accommodations in the filming of these productions and was allowed to film at home in a quiet, controlled setting to avoid stress or environments that could worsen her disability. (Townsend Decl. ¶5). The production involved a physical crew, camera equipment, and on-site filming conducted at a public location.

In or around January 2010, Plaintiff was secretly filmed in public several months after the October coverage of her initial symptoms. During this time, correspondent Les Trent approached and confronted Plaintiff to discuss what he described as her "remarkable recovery." Plaintiff did not attempt to evade the interaction; she responded politely to all questions and even offered, and later provided, the Inside Edition production team with a medical record from a recent visit to her treating neurologist at the time, Dr. Ruben Cintron. (FAC ¶¶ 37–40; Hartman Decl. Ex. 41, Pg. 30; Townsend Decl. Ex. 2).

## III. STANDARD ON REPUBLICATION AND ACCRUAL (CALIFORNIA SINGLE-PUBLICATION RULE)

California's single-publication rule provides that a claim based on a mass communication generally accrues upon the first general distribution of the publication. *Shively v. Bozanich,* 31 Cal. 4th 1230, 1245 (2003). A republication, however, "restarts" the limitations period. A republication occurs when the material is reissued to a new audience, in a new format or edition, through a new distribution channel, or with substantive changes. *Christoff v. Nestlé USA, Inc.*, 47 Cal. 4th 468, 476, 479–81 (2009). Whether later uses constitute republications is a fact-intensive inquiry; the Supreme Court in *Christoff* remanded for that very determination. *Id*. at 481. The discovery rule generally does not delay accrual under the single-publication rule unless the initial publication was hidden from view or otherwise not reasonably discoverable. *Shively*, 31 Cal. 4th at 1248–49.

## IV. ARGUMENT

The anti-SLAPP statute was never intended to grant defendants blanket immunity from liability simply because their conduct involves petitioning or free speech. Rather, as the California Supreme Court explained, '[t]he anti-SLAPP statute does not insulate defendants from any liability for claims arising from the protected rights of petition or speech. It only provides a procedure for weeding out, at an early stage, meritless claims arising from protected activity.' *Monster Energy Co. v. Schechter*, 7 Cal. 5th 781, 788 (2019).

Evaluating an anti-SLAPP motion follows a well-established two-step process. First, the defendant bears the initial burden of showing that the challenged cause of action arises from activity protected under Code of Civil Procedure § 425.16. *Id*. at 788. If that showing is made, the analysis proceeds to the second step, where the burden shifts to the plaintiff to demonstrate a probability of prevailing on the merits. At this stage, the plaintiff's evidence must be taken as true, and the court's review is limited to determining whether the complaint states a legally sufficient claim and whether the plaintiff has made a prima facie factual showing adequate to support a favorable judgment. *Id*.

## V. POINT I

### A. <u>Defendants' Statements Are Not Protected Activity Because They Convey Falsehoods by Implication and Omission</u>

Inside Edition's claim that "nothing was false" is both inaccurate and misleading. The Segment makes multiple factual assertions about Plaintiff's symptoms, recovery, and the cause of her condition, assertions that are directly contradicted by medical records, treating physician statements, and contemporaneous video evidence. For example, Inside Edition claims it "observed her walking normally … even getting behind the wheel of a car and driving." That is a concrete factual statement about Plaintiff's physical condition — and it is materially false or, at minimum, highly misleading. Plaintiff's pleadings and medical records establish that she remained symptomatic at the time of filming, that her

gait was impaired under specific conditions, and that any brief appearance of "normal walking" was achieved only under the controlled circumstances of the production and while Plaintiff was medicated pursuant to her treatment plan. Presenting those selectively filmed moments as evidence of recovery distorted the reality of her condition. Likewise, Inside Edition cited a neurologist's opinion that there was "a strong psychogenic component" to her symptoms — a statement that directly conflicts with the findings and conclusions of Plaintiff's treating physicians, which were provided to Inside Edition at the time of production. By omitting that context, Defendants presented a false and defamatory impression of Plaintiff's condition and its cause. Because those statements rest on disputed facts — including the medical effects of prescribed treatment and the circumstances under which the footage was obtained — they cannot be dismissed as "true" as a matter of law. Even where statements are couched as opinion, they are not immune from challenge: to the extent an opinion is based on false or incomplete facts, it is actionable. *Milkovich v. Lorain Journal Co*., 497 U.S. 1, 18–20 (1990).

A motion may only be brought pursuant to Section 425.16 as to a cause of action that arises from conduct "in furtherance of the [defendant's] right of petition or free speech ... in connection with a public issue." Code Civ. Proc. § 425.16(b); *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1062. The Defendants bear the burden of first establishing that a claim arises from speech on a "public issue." *Wilcox v. Superior Court* (1994) 27 Cal.App.4th 809, 820; *Turnbull v. Lucerne Valley Unified School District* (2018) 24 Cal.App.5th 522, 531. Unless the defendant satisfies this requirement, a court does not consider the merits of the claim. *Coretronic Corp. v. Cozen O'Connor* (2011) 192 Cal.App.4th 1381, 1388 ("Arguments about the merits of the claims are irrelevant to the first step of the anti-SLAPP analysis"); *Freeman v. Schack* (2007) 153 Cal.App.4th 719, 733. To meet his burden, Defendants must establish that Plaintiff's claim arises from "free speech in connection with a public issue or an issue of

public interest" Code Civ. Proc. § 425.16(e)(4).

**B. <u>Defendants' Defamatory Statements Are Not In The Public Interest</u>**

Defendants fail to meet their burden of demonstrating that Plaintiff's claims arise from protected activity under Code of Civil Procedure § 425.16. Their statements were not directed at a matter of public concern, which requires that "the constitutionally protected activity must, at a minimum, occur in the context of an ongoing controversy, dispute or discussion." *Du Charme v. International Brotherhood of Workers* (2003) 110 Cal.App.4th 107, 119. No such ongoing controversy existed here. Defendants' broadcast did not contribute to any broader public debate, nor was it part of a larger discussion about public health or policy. Instead, it targeted Plaintiff — a private individual — and focused on deeply personal medical information that was never of concern to a substantial number of people. The limited local coverage that occurred in October and early November 2009 had long since dissipated by the time the February 2010 broadcast aired. As the California Supreme Court has explained, speech about a purely private matter concerning a private individual does not implicate the public interest. *See Geiser v. Kuhns*, 13 Cal. 5th 1238, 1248 (2022). The does not apply where the issue is of concern only to a small, specific audience, rather than the public at large.

The determination of whether speech involves a "public issue" or "issue of public interest" requires a two-step analysis. *FilmOn.com, Inc. v. DoubleVerify Inc.*, 7 Cal. 5th 133, 149 (2019). **First**, a court must identify what "public issue or issue of public interest the speech in question implicates" by examining the content of the speech. **Second**, the court must assess the functional relationship between that speech and the broader public conversation about the issue. *Id*. at 149–50. It is this second step — the nexus between the speech and public discourse — where context becomes particularly significant.

Importantly, the inquiry does not turn on the "social utility" of the speech or the extent to which it might influence broader public discourse — including, for example, any generalized debate about the safety or efficacy of vaccines. Rather, the relevant

question is whether the defendant, through its speech or conduct, "participated in, or furthered, the discourse that makes an issue one of public interest." *Id*. at 150.

Here, Defendants' conduct fails this test. Any limited media coverage of Plaintiff's condition — primarily confined to local news outlets in the Washington, D.C. area — had dissipated months prior to the February 4, 2010 Segment and did not contribute to an ongoing public conversation or address a matter already of widespread concern. Instead, it manufactured a controversy where none existed, deliberately thrusting Plaintiff's private medical condition into public view and attempting to transform a private, medically documented disability into a sensationalized matter of supposed public debate. Such speech does not qualify as participation in a public conversation under *FilmOn* and falls outside the scope of Code of Civil Procedure § 425.16.

Far from addressing a matter of public importance, the segment targeted deeply private facts about Plaintiff's neurological disability — a condition that has required ongoing treatment by physicians, invasive procedures including a feeding tube, and intensive-care hospitalizations. (Townsend Decl. ¶ 36.) This is not a matter of public debate but of personal medical privacy. As the court observed in *Weinberg v. Feisel,* 110 Cal. App. 4th 1122, 1132 (2003), "a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest," and "the focus of the speaker's conduct should be the public interest rather than a mere effort to gather ammunition for another round of private controversy."

## VI. POINT II

### A. <u>Plaintiff's Claim Has Minimal Merit</u>

Even assuming, arguendo, that Defendants satisfy their initial burden under the first prong of the anti-SLAPP statute by showing that their allegedly false statements about Plaintiff fall within the scope of protected activity, their motion must still fail if Plaintiff can demonstrate that her claims possess at least "minimal merit." *Manzari v. Associated Newspapers Ltd.*, 830 F.3d 881, 887 (9th Cir. 2016).

At this second stage of the anti-SLAPP inquiry, the applicable standard depends on the nature of the motion. As the Ninth Circuit explained, federal courts "apply different standards depending on the motion's basis." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 833 (9th Cir. 2018). Where the motion is premised solely on legal arguments, the court evaluates it under the standards of Fed. R. Civ. P. 8 and 12. However, if the challenge is factual, the motion must be treated as a summary judgment motion, and the parties are entitled to conduct discovery. *Id*. at 834.

Defendants raise a series of intertwined legal and factual challenges to the First Amended Complaint that cannot be resolved without discovery. On one hand, they argue that Plaintiff is a public figure simply because she created a TikTok account with roughly thirty followers to share policy ideas for the City of Los Angeles — an account that has generated no public controversy or meaningful attention. On the other hand, they simultaneously contend that Plaintiff has not been defamed because "no false statements" were made about her. Yet, in the very next breath, they invoke *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 273–74 (1971), for the proposition that "[f]ew personal attributes are more germane to fitness for office than dishonesty, malfeasance, or improper motivation, even though these characteristics may also affect the official's private character." (Defendants' Special Motion to Strike, p. 7).

These positions are logically inconsistent. Defendants cannot simultaneously maintain that (1) no false statements were made and (2) that Plaintiff's honesty and character are legitimately subject to scrutiny because of hypothetical future political ambitions — particularly where Plaintiff has taken no steps toward candidacy and now resides in Washington, D.C. (Townsend Decl. ¶ 34). If Defendants' statements did, in fact, place her integrity, motivation, or honesty at issue, then they necessarily conveyed defamatory implications about her character — the very kind of assertions that require factual development through discovery.

**B. <u>Plaintiff's Stated Claim For Defamation And Proof Of Malice</u>**

Plaintiff's defamation claim centers on the Segment's manipulative framing. By

selectively editing and splicing footage to present the broadcast as an "exposé," Defendants deliberately created the false impression that Plaintiff's ordinary daily activities — filmed months after the initial crisis and while she was under her neurologist's care — reflected a "remarkable recovery" inexplicable by medication or reduced stress. NBC News later characterized the production most accurately in 2023 as "an ambush interview in which Desiree was painted as a faker." The Segment's calculated staging thus achieved precisely the intended defamatory effect: it falsely insinuated that Plaintiff had fabricated her condition or was mentally unstable, while concealing from viewers the truth documented in her treating physician's medical records that she was medicated and improving under ongoing clinical treatment.

Defendants' focus and framing of the Segment demonstrate a reckless disregard for the truth. They devoted substantial portions of the broadcast to discussing and scrutinizing controversial anti-vaccine doctor Rashid Buttar, despite explicitly acknowledging that Plaintiff was no longer under his care, while relegating mention of her actual treating neurologist to a brief, passing comment at the very end of the Segment. Their selective use of a single statement from that physician — that he believed Plaintiff's symptoms were "vaccination induced" — while omitting the broader context of her ongoing treatment and documented clinical improvement, evidences malice of the highest order.

The finding of malice is further supported by the fact that two prior Inside Edition segments filmed in October 2009, which accurately documented Plaintiff's disability, were later scrubbed from Defendants' platforms in favor of the defamatory Segment. In fact, Plaintiff was unaware of this removal until Defendants' submission of their exhibits, which necessitated retrieving the original broadcasts through the Internet Archive (web.archive.org). The deliberate removal of those earlier, more accurate reports — particularly when contrasted with the continued republication and promotion of the 2010

Segment — speaks volumes about Defendants' intent and evidences a calculated effort to shape public perception in a defamatory manner.

Furthermore, facts that have come to light following Defendants' submission of their exhibits warrant discovery to determine the applicable statute of limitations under the republication doctrine. Plaintiff has since uncovered that the Segment titled "Flu Shot Woman," which she previously believed to be the original online article and video published contemporaneously with the 2010 broadcast, was in fact not posted to the internet until at least a decade after the original television airing. (See https://www.insideedition.com/159-flu-shot-woman). (Townsend Decl. Exs. 7, 8). This delayed online publication — materially distinct from the 2010 broadcast — constitutes a republication event that resets the limitations period and underscores the need for discovery into the timing and circumstances of its release.

The same pattern of concealment has been uncovered through Plaintiff's examination of Defendants' exhibits, which reveal that the accompanying press release was likewise not originally published in 2010, but instead republished multiple times over the years. (Townsend Decl. Exs. 11-13). It first appeared on the ViacomCBS and CBS Sports press site (www.viacomcbspressexpress.com/cbs-sports/releases/view?id=24173), later redirecting to the Paramount and CBS Sports platform (www.paramountpressexpress.com/cbs-sports/releases/view?id=24173). At some point thereafter — on a date unknown to Plaintiff — the press release was relocated again, this time to the Paramount and CBS Media Ventures website (https://www.paramountpressexpress.com/cbs-media-ventures/shows/inside-edition/releases/?view=24173), where it remained accessible until its removal in April. This evolving publication history underscores Defendants' continued republication of the defamatory material and their concealment of those republications from Plaintiff's knowledge.

If the foregoing discoveries were not sufficient to establish actual malice, then Defendants' own conduct following the original broadcast removes any doubt. Despite admitting to the removal of the video Segment from their own platforms, Defendants have nevertheless permitted — and continue to permit — its republication, either through a yet-to-be-determined licensing agreement with NBC for its 2022 and 2023 news segments about Plaintiff, or through continued use by Access Hollywood host Mario Lopez and, subsequently, multiple TikTok accounts. Such actions demonstrate not only that Defendants originally produced the Segment with reckless disregard for the truth, but that they have knowingly allowed its repeated republication on new platforms, including social media, despite full awareness of the ongoing harm it continues to cause Plaintiff.

The fact remains that Defendants knew the truth, as reflected in the medical record they deliberately disregarded in favor of a false and defamatory narrative. The producers themselves stated their intention to "tell the real story" (Townsend Decl. Ex. 32), yet the story they chose to tell was one that distorted the facts rather than reported them. This selective framing stands in stark contrast to Defendants' treatment of a nearly identical situation involving singer Celine Dion (Townsend Decl. Exs. 26–28). The December 20, 2023 Inside Edition segment titled "Celine Dion's Sister Says Singer Has No Control of Her Muscles Amid Battle With Stiff-Person Syndrome" reported on Dion's severe loss of muscle control and included her sister Claudette Dion's statement that "We can't find any medicine that works." A follow-up segment on June 18, 2024, titled "Celine Dion Tearfully Thanks Her Fans at Film Premiere," depicted Dion walking and speaking normally at a widely publicized event. Yet despite this apparent improvement, Inside Edition did not accuse Dion of a "remarkable recovery," nor did it question the authenticity of her condition — a stark double standard that underscores the defamatory intent behind the framing of Plaintiff's story.

### C. <u>Plaintiff Is Not A Public Figure Or Limited-Purpose Public Figure</u>

Plaintiff is a private individual whose limited notoriety from the 2009 "Flu Shot

Woman" coverage had long since subsided. She did not seek, invite, or engage in any publicity concerning her medical condition in 2024, when Defendants permitted Mario Lopez to republish their Segment — which remains publicly accessible despite the clear and ongoing harm it has caused. It was Lopez's June 2024 Instagram post, relying on Defendants' Segment, that reignited public attention and involuntarily thrust Plaintiff back into the public spotlight. Defendants cannot manufacture publicity through defamatory conduct and then invoke that manufactured attention as a basis to recast Plaintiff as a public figure. The characterization of "public figure" falls into two narrow categories: the all-purpose public figure, and the limited-purpose or "vortex" public figure. (*Gertz v. Robert Welch, Inc*. (1974) 418 U.S. 323, 351; *Reader's Digest Ass'n v. Superior Court* (1984) 37 Cal.3d 244, 253). An all-purpose public figure is one who has achieved "pervasive fame or notoriety" and is a public figure for all purposes. A limited-purpose public figure is one who "voluntarily injects" into a specific public controversy, seeking to influence its resolution. (*Copp v. Paxton* (1996) 45 Cal.App.4th 829, 845–846).

None of these elements are present here. First, the defamation does not arise out of any true "public controversy." To qualify, the issue must be debated publicly and have foreseeable and substantial ramifications for nonparticipants. (*Copp*, supra, at p. 845.) Defendants mischaracterizes the case as concerning a broad "vaccine" debate. In reality, the defamatory Segment they allowed to be republished accused Plaintiff personally of malingering a neurological disability—a false assertion stated as fact, not commentary on public policy. (FAC ¶ 12; RJN Exs. A–B.) Second, Plaintiff did not voluntarily thrust herself into this supposed controversy. California courts consistently hold that limited-purpose public figure status requires "voluntary" injection into a matter of public concern. (*Reader's Digest*, supra, 37 Cal.3d at 254; *Ampex Corp. v. Cargle* (2005) 128 Cal.App.4th 1569, 1577–1578). Plaintiff has made no such effort. Her private medical

condition was weaponized without her consent again, this time through a defamatory post made by a celebrity to his millions of followers on Instagram.

Third, the defamatory accusations are not "germane" to any public controversy Plaintiff participated in, as required under *Copp*. Instead, they were a personal smear designed to ridicule and discredit her. Accordingly, Plaintiff is neither an all-purpose public figure nor a limited-purpose public figure. She remains a private individual entitled to the standard protections of California defamation law. Even if the Court were to apply the heightened "actual malice" standard applicable to public figures, Defendants' conduct would still satisfy it.

**D. Judicial Notice of the Vaccine Court Decision Does Not Establish the Truth of Its Findings**

Defendants seek to have this Court judicially notice not merely the existence of a Vaccine Court decision, but the truth of its factual determinations — including disputed conclusions regarding Plaintiff's medical diagnosis and causation. This is improper. Courts routinely reject attempts to convert judicially noticed documents into substantive proof of disputed facts. (*Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001); *Khoja v. Orexigen Therapeutics, Inc*., 899 F.3d 988, 999 (9th Cir. 2018)). The Vaccine Court's findings are not "facts" of which judicial notice may be taken; they are opinions and conclusions reached in a separate administrative proceeding based on a different evidentiary record.

Moreover, those findings are directly contradicted by other federal determinations — including the Social Security Administration's award of disability benefits — further underscoring that the nature, cause, and authenticity of Plaintiff's condition are not facts "generally known" or "beyond reasonable dispute" under Fed. R. Evid. 201(b). Plaintiff's disability was not a "mental disorder," as Defendants characterize it, nor would she have remained on disability for years following the Special Master's decision — including after a subsequent SSA disability review — if her symptoms were not genuine. The SSA

continued to find Plaintiff disabled until she herself notified the agency in 2023 of her intent to return to work and voluntarily discontinue benefits.

## VII. PLAINTIFF'S OBJECTIONS TO DEFENDANTS' IMPROPER REQUEST FOR JUDICIAL NOTICE

Plaintiff objects to Defendants' Request for Judicial Notice as it pertains to Exhibits to the Hartmann Declaration, on the grounds that these materials are offered not as "adjudicative facts not subject to reasonable dispute" under Federal Rule of Evidence 201, but rather for disputed characterizations, legal conclusions, and argumentative inferences.

Defendants ask the Court to take judicial notice of "the fact that there had been significant news media coverage of and public interest in Plaintiff, including her claims and condition, dystonia, and/or the safety and efficacy of vaccinations" before the February 2010 broadcast, between 2010 and 2018, and from 2020 through 2024. These requests exceed the narrow scope of Rule 201. Plaintiff does not object to the Court taking notice of the existence of the media articles, broadcasts, and online publications in these exhibits, their publication dates, or the fact that they reference Plaintiff. However, Defendants' invitation for the Court to judicially notice that such coverage was "significant" or that it demonstrates "public interest" is improper because it seeks adoption of their subjective interpretation — a use of judicial notice that Rule 201 squarely forbids.

Similarly, Defendants request judicial notice of "the fact that Plaintiff holds herself out as a person in the public eye, including by running as a candidate for Mayor of Los Angeles." Plaintiff does not dispute the existence of these online materials, which reflect a limited exploratory effort to create a webpage referencing a potential candidacy. But Defendants' request that the Court judicially notice the "fact" that such activity constitutes "holding herself out as a public figure" is again an impermissible legal conclusion and beyond the proper scope of Rule 201.

Finally, Defendants cannot selectively rely on the Vaccine Court's "psychogenic" characterization to support their accusation that Plaintiff was "faking," while disregarding that the same federal agency — acting under a separate statutory mandate — has already recognized the physiological nature of her disability. This contradiction underscores the weakness of Defendants' premise and highlights the improper use of judicial notice to advance a defamatory narrative inconsistent with the government's own findings.

## VIII. CONCLUSION

Unfortunately for Defendants, this is not Back to the Future — they cannot rewind the clock and erase the extensive trail of publications, press releases, and platform migrations that have occurred since 2010. Many of these republications were only recently uncovered by Plaintiff through a careful and thorough review of Defendants' own exhibits and declarations, discoveries that form the basis for delayed accrual under the applicable law. For these reasons, the Motion should be denied. And if the Court concludes that Plaintiff's First Amended Complaint or evidentiary showing is lacking in any respect, Plaintiff respectfully requests leave to conduct discovery or to amend her pleadings accordingly.

Dated: October 6, 2025

By:______________________ _________
DESIREE GUERRIERE TOWNSEND
Plaintiff

**CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.2**

Plaintiff certifies that this brief contains 5,341 words (excluding the caption, tables, signature block, and this certification) in compliance with the word limit of L.R. 11-6.1.

Dated: October 6, 2025

By:______________________

DESIREE GUERRIERE TOWNSEND
Plaintiff