Desirée Townsend
2901 Ocean Park Blvd., Suite 201
Santa Monica, CA 90405
desiree@sparktrademarks.com
PLAINTIFF IN *PRO SE*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

DESIREE GUERRIERE TOWNSEND, an individual,

Plaintiff,

v.

PARAMOUNT GLOBAL, a Delaware corporation; CBS BROADCASTING INC., a New York corporation; and INSIDE EDITION INC., a New York corporation,

Defendants.

Case No. 2:25-cv-04077-MRA-DFM

Honorable Mónica Ramírez Almadani

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SIXTH CLAIM FOR RELIEF**

[*Filed concurrently with Plaintiff's Opposition to Defendants' Special Motion to Strike the First Amended Complaint; Request for Judicial Notice; and [Proposed] Order*]

**Date:** **October 27, 2025**
**Time:** **1:30 p.m.**
**Courtroom:** **9B, 411 West 4th St. Santa Ana, CA 92701**

# TABLE OF CONTENTS


I. INTRODUCTION ........ 3

II. FACTUAL BACKGROUND ........ 6

A. Pre-Production Filming Events (2009–2010) ........ 6

B. Post-Production Actions And Republications (2022–2025) ........ 6

III. ARGUMENT ........ 8

A. Plaintiff's Request For Accommodations Are Not Time Barred And Injunctive Relief Must Be Granted ........ 8

B. The Ninth Circuit Requires Online Services To Be Accessible Under Title III If There Is a Nexus Between the Website and Physical Locations ........ 10

C. Proof Of Intentional Discrimination Is Not Required — Yet The Discrimination Against Plaintiff Is Undeniable ........ 12

D. Defendants Extend Pre- And Post-Production Accommodations To Disabled Performers But Refuse To Provide Them To Disabled News Subjects ........ 14

IV. CONCLUSION ........ 17

## I. INTRODUCTION

Defendants seek dismissal of Plaintiff's Title III ADA and Unruh Act claims by recasting the violations as a one-off "editorial choice" tied solely to a February 4, 2010 *Inside Edition* television segment (the "Segment"). That characterization ignores both the ADA's broad remedial purpose and the pled facts. *Inside Edition* is a traveling, public-facing production service, conducting on-location filming in physical spaces of Defendants' choosing. The challenged Segment is the product of those services and remains within Defendants' control; through post-production activities they continue to edit, host, republish, license and allow it across brands and social-media platforms, bringing it to new audiences long after 2010. These are precisely the types of services offered by a "place of public accommodation" under Title III — a concept the Ninth Circuit has expressly expanded beyond physical spaces to include services that have a sufficient "nexus" to a physical location. *See Robles v. Domino's Pizza*, LLC, 913 F.3d 898, 905 (9th Cir. 2019). Moreover, Defendants have already extended comparable post-production modifications and accommodations to disabled performers in their scripted programming — demonstrating both the feasibility of such measures and the absence of any undue financial or administrative burden in providing them here.

Defendants' own conduct confirms the feasibility of accommodation: their public-relations division removed a press release at Plaintiff's disability-based request, yet the production division refused an identical accommodation for the Segment—to remove, update, or correct disability-related medical information based on treating-physician records. That selective refusal reflects discriminatory policies, practices, and procedures and an ongoing violation. Accepting Defendants' framing would immunize modern media enterprises from the ADA whenever discrimination occurs before, during, or after production. Title III and the Unruh Act require more. At the pleading stage, Plaintiff's allegations—(i) public-facing, physical production services; (ii) continued control and republication; and (iii) feasible yet denied accommodations—are more than sufficient to defeat dismissal and allow this claim to proceed to discovery.

At this stage, Plaintiff is entitled to have well-pleaded allegations accepted as true and all reasonable inferences drawn in her favor, and, to the extent any claim is found insufficiently pled, Plaintiff respectfully requests leave to amend to cure any perceived deficiency. Those allegations raise at three distinct questions before this Court:

- **Statute of Limitations:**
    1. **Republication/Accrual:** Does Defendants' republication of their original 2010 television broadcast, including the republication and/or licensing of the segment to third parties in 2023, 2024, and 2025, restart the statute of limitations for claims brought under Title III of the ADA, which borrows California's two-year personal injury limitations period?
    2. **Accommodation Denial/Accrual:** Does the statute of limitations for a failure-to-accommodate claim restart when Defendants granted a post-production, disability-related accommodation by removing a press release upon request, yet subsequently denied a substantially similar accommodation from their production team to update or correct medical information in the associated article—even though the video of the broadcast and the press release had already been removed from their platforms?
    3. **Continuing-Violation Doctrine:** Does the doctrine apply where Defendants (i) provided pre-production accommodations in 2009 allowing Plaintiff to be filmed at home, (ii) withdrew those accommodations in 2010 and staged an unannounced, on-location parking-lot confrontation, and (iii) maintain a company-wide practice of denying production-side accommodations to disabled news subjects—while accommodating disabled performers—thereby causing continuing, ongoing harm?
- **Public Accommodation:** Do Defendants' traveling production services, including on-location filming and newsgathering offered to the public, constitute "places of public accommodation" within the meaning of Title III? Do their production

services extend to post-production when sensitive medical information is disclosed to the public?

- **Scope of Accommodations:** Does Title III require a public accommodation to provide post-production reasonable modifications—including correction, annotation, or removal—of disability-related medical information disseminated in a news broadcast where the broadcast relied on secondary or tertiary sources despite the availability of primary, individualized treating-physician records? Does the ADA impose a duty to correct, update, or remove previously published disability-related content when primary medical evidence later shows that earlier reliance on non-primary sources was inaccurate?

Plaintiff submits that each question raised must be answered in her favor: the ADA claim is timely under both the republication doctrine and continuing violation doctrine with the recent, disparate treatment Plaintiff received in April of 2025 — where Defendants' public relations team granted a requested accommodation by removing a press release due to its harmful impact on her disability, while Defendants' production team denied a substantially similar accommodation request regarding the broadcast itself; Defendants' production operations function as places of public accommodation; and the Act requires reasonable modifications not only when disabled individuals appear during filming, but also when their medical information is presented to the public to inform the content ultimately broadcast.

Defendants' own past conduct demonstrates that they are fully capable of providing accommodations when they choose to. Plaintiff received accommodations twice before for the filming of the October 16 and October 23, 2009 Inside Edition broadcasts, when Defendants coordinated on-site filming at her home on account of her disability. Yet months later, those accommodations were abruptly abandoned for what NBC News in a 2023 report, described as an "ambush," in a parking lot. That pattern of selective compliance has persisted to this day. Defendants' decision to accommodate

when convenient, and to revoke those same accommodations when they conflict with a preferred narrative of a disabled individual is not merely unethical; it is unlawful.

## II. FACTUAL BACKGROUND

### A. Pre-Production Filming Events (2009–2010)

Plaintiff was deemed legally disabled on February 6, 2012, after a long and careful review process conducted by the Social Security Administration with a disability onset date of September 17, 2009. (Townsend Decl. ¶5, Ex. 2). Plaintiff was diagnosed with autonomic dysfunction and deemed disabled on that basis. (Hartmann Decl. Ex. 41, at 16, 34, 51). She has received disability-related services that enable her to participate in public life, including attending Saddleback College. (*Id* at Pg. 51). In October of 2009, Inside Edition filmed two productions with Plaintiff "depicting her muscle spasms and slurred speech, and how she could walk backward—but not forward—normally." (Defendants Special Motion to Strike, ECF 14; Hartman Decl. Exs. 10, 11). Plaintiff was granted reasonable accommodations in the filming of these productions and was allowed to film at home in a quiet, controlled setting to avoid stress or environments that could worsen her disability. (Townsend Decl. ¶5).

On or about January 2010, Inside Edition conducted a third production, but Plaintiff received no advance notice and had no opportunity to request the same at-home accommodations previously provided. (Townsend Decl. ¶ 5). The filming occurred in the parking lot of a shopping plaza. Afterward, Defendants followed Plaintiff to her home to obtain a medical record from her treating physician at the time, however, that exchange was not filmed. (FAC ¶ 38; Townsend Decl. ¶¶ 5–6; ECF No. 14). All three productions involved a physical crew, camera equipment, and on-site filming setup. (Townsend Decl. ¶ 5).

### B. Post-Production Actions And Republications (2022–2025)

Audio clips from Defendants' Inside Edition Segment were republished by NBC News on May 11, 2022, as part of an episode titled "The Playbook" on the podcast *Truthers: Tiffany Dover Is Dead** (Hartmann Decl. Ex. 42, ECF No. 16-47). Video clips

from the same segment were republished again by NBC News on August 4, 2023, in a feature piece titled "The 'Flu Shot Cheerleader' is back — with a warning about the anti-vaccine movement." (Hartmann Decl. Ex. 44, ECF No. 16-49). That NBC News article described the Inside Edition broadcast as an "ambush interview in which Desiree was painted as a faker." The *Inside Edition* Segment was subsequently followed by an ABC News 20/20 investigation entitled "Medical Mystery or Hoax?" (Hartmann Decl. Exs. 34, 44, ECF Nos. 16-39, 16-49).

On or about June 19, 2024, NBCUniversal's Access Hollywood host Mario Lopez republished the same Inside Edition segment previously used by NBC News in its two prior republications, posting it to his social media account with approximately 3.2 million followers, where it quickly garnered over one million views (FAC ¶¶ 8, 43; Townsend Decl. ¶¶ 15, 16). Plaintiff first discovered this republication on March 10, 2025. (FAC Pg. 21, ¶ 43). Shortly thereafter, the same Inside Edition segment was again republished on two TikTok accounts — @lightlyseasonedmike and @didyoucatchthis — within hours of each other, where the posts rapidly accumulated millions of views (FAC ¶ 44). The social media platform TikTok did not exist at the time the segment originally aired in 2010 (FAC at 20 ¶ 47).

On or about April 10, 2025, Plaintiff searched her former name online in an effort to trace the source of the resurfaced broadcast through TikTok and discovered an accompanying press release (FAC at 23 ¶ 46). That same day, she emailed three employees affiliated with the public relations teams at CBS, Paramount, and ViacomCBS, detailing her disability diagnosis and requesting a reasonable accommodation — specifically, the removal of the press release — due to the ongoing harm it was causing (FAC at 23 ¶ 47; Ex. B). On April 14, 2025, Bettina Cataldi, Senior Manager of Publicity for CBS, responded and confirmed that the press release had been removed (FAC at 23 ¶ 48; Ex. B).

However, the removal did not stop the hateful online commentary directed at Plaintiff. As a result, she submitted a second accommodation request on April 16, 2025,

this time seeking to be connected with a member of the production team to correct or update the broadcast with accurate medical information (FAC at 23 ¶ 49). Plaintiff explained that a medical record from her treating physician at the time had been provided to the Inside Edition production team, yet they instead relied on a third-party report from the CDC. (FAC Pg. 23, ¶¶ 47, 49; Townsend Decl. Ex. 1; Hackett Decl. Ex. 1). That request for accommodations was denied.

On or about April 17, 2025, Ms. Cataldi responded, stating: "This video does not appear on our digital platforms. It is unfortunate that you have been subjected to hateful comments, but we do not have the ability to police the behavior of people on online platforms we do not control." (FAC ¶ 50; Townsend Decl. Ex. 1; Hackett Decl. Ex. 1).

On April 18, 2025, Plaintiff timely delivered a retraction demand pursuant to California Civil Code § 48a(a), requesting that Defendants issue a retraction in light of the republication of the Segment through two TikTok accounts on April 4 and 5, 2025, which republished the same video published to Mario Lopez's Instagram account on June 19, 2024. Service of the demand letter was effective and Defendants acknowledged the letter and formally declined the request, characterizing Plaintiff's submission of her medical record as merely "talking points," "key facts," or "context" that Inside Edition was under no obligation to report. (FAC ¶ 32; Ex. C).

## III. ARGUMENT

### A. Plaintiff's Request For Accommodations Are Not Time Barred And Injunctive Relief Must Be Granted

Because the ADA does not contain a specific statute of limitations, federal courts apply the statute of limitations of the most analogous state law. *See Pickern v. Holiday Quality Foods Inc.*, 293 F.3d 1133, 1137 n.2 (9th Cir. 2002)(applying California's one-year personal-injury limit to ADA claim). Here the parties do not dispute that the Ninth Circuit has not explicitly ruled which California statute provides the appropriate limitations period, but it recently observed that "the only conceivable options are California's two-year personal injury provision and its three-year period for an action

upon a liability created by statute." *See Estate of Stern v. Tuscan Retreat, Inc*., 725 F. App'x 518, 526 (9th Cir. 2018) (citing Cal. Civ. Proc. Code §§ 335.1, 338(a)).

Similarly, unlike the plaintiff in *Pickern*, who had not attempted to access the defendant's facility during the limitations period, Plaintiff here has recently and actively sought access to Defendants' pre- and post-production services within the statutory period. In 2025, Plaintiff submitted accommodation requests to address ongoing harm from Defendants' broadcast — one directed to the public relations team, which resulted in the removal of a harmful press release, and a second directed to the production team, seeking correction or updating of medical information disseminated in the broadcast itself. While the former was granted, the latter was denied, thereby continuing to exclude Plaintiff from equal access to the production services offered to the public. This denial has caused ongoing, concrete injury and is far from the "futile gesture" discussed in *Pickern*; rather, Plaintiff's active attempts to obtain accommodations demonstrate a present, "actual or imminent" injury sufficient for standing and support the timeliness of her claims.

Plaintiff has standing to seek prospective injunctive relief because she faces an imminent, real, and continuing threat from Defendants' ongoing practices of republishing and licensing the *Inside Edition* segment without providing disability-related accommodations. Here, the threat is ongoing and concrete. Defendants have continued to distribute, republish, and (on information and belief) license the segment to NBC—including uses in 2022, 2023, and 2024—while denying the same disability accommodations their own PR team previously provided for closely related content (removal of the press release). That ongoing combination, active distribution plus repeated refusal to accommodate, creates precisely the "actual or imminent" injury to satisfy the "injury in fact' requirement. *Pickern*, 293 F.3d at 1134. When such a plaintiff seeks injunctive relief against an ongoing violation, he or she is not barred from seeking relief either by the statute of limitations or by lack of standing.

Furthermore, the Ninth Circuit has clarified that the continuing-violation doctrine is not triggered merely because the consequences of a prior act continue to be felt; rather, there must be subsequent unlawful acts within the limitations period. *Bird v. Dep't of Human Servs.*, 935 F.3d 738, 747 (9th Cir. 2019). However, *Bird* distinguishes such residual consequences from a series of "repeated instances of the same or similar conduct" or "recurrent applications" of a policy, which do trigger a new accrual period. Id. (explaining that the doctrine may apply where a plaintiff "alleges repeated instances of the same conduct" as opposed to "a single act with continuing consequences").

That is precisely the situation here. Defendants' conduct was not a single act in 2010 with residual consequences. Instead, they have repeatedly engaged in new, independent acts of discrimination and exclusion — including republications of the Inside Edition segment in 2022, 2023, and 2024; licensing the segment to third-party platforms; and denying new requests for reasonable modifications in April 2025. Each of these constitutes a discrete discriminatory act under Title III, triggering a new accrual period and rendering Plaintiff's claim timely under the continuing-violation doctrine.

### B. The Ninth Circuit Requires Online Services To Be Accessible Under Title III If There Is a Nexus Between the Website and Physical Locations

Courts in the Ninth Circuit have repeatedly held that Title III of the ADA extends beyond traditional brick-and-mortar spaces to include the services, privileges, and advantages offered by public-facing entities online. While Title III's text refers to a "place of public accommodation," Ninth Circuit precedent recognizes that websites, broadcast services, and digital platforms can fall within its reach where they are "nexus-linked" to physical locations that themselves qualify as places of public accommodation.

In *Robles v. Domino's Pizza, LLC*, 913 F.3d 898 (9th Cir. 2019), the court held that Domino's website and mobile application were subject to Title III because they had a "nexus" to the company's physical restaurants — allowing customers to order pizzas, locate stores, and access promotions. The court rejected Domino's argument that the ADA applies only to physical locations, reasoning instead that "the ADA applies to the

services of a place of public accommodation, not services in a place of public accommodation." *Id*. at 905 (emphasis added). Likewise, courts in this Circuit have consistently applied the nexus test to hold that websites and digital services that facilitate or extend the services of a physical business are themselves covered by Title III. *See, e.g., Robles*, 913 F.3d at 905;

Here, Defendants' broadcast, digital, and online media services easily satisfy the nexus test. Their websites, news segments, and published articles are not standalone editorial products created in isolation from physical spaces. Rather, they are the direct extensions and final outputs of a complex production process that originates in the physical world: including on-site filming, field reporting, in-person interviews, constructed sets, and coordinated technical operations. Much like a pop-up retail shop that temporarily appears in different locations to serve the public, Defendants' news-gathering services are deployed where stories unfold, involving crews, equipment, and personnel who physically enter public and private spaces to gather and produce content. Once completed, those productions are edited, packaged, and disseminated through Defendants' broadcast channels, websites, and digital platforms — the very vehicles that distribute, monetize, and amplify the work initiated in those physical locations. Because these online services are inseparable from and wholly dependent on the physical production process, they are subject to Title III's accessibility requirements.

Defendants' news production operations themselves are anchored in physical spaces — including on-location reporting, field interviews, and filming on constructed sets — all of which require the coordination of crews, equipment, and personnel in the physical world. These production activities are not incidental to the broadcast; they are the essential services by which Defendants gather, create, and deliver news content to the public. Significantly, Defendants already provide accommodations in these settings to performers, employees, and other on-camera talent — demonstrating both the feasibility and necessity of such modifications within their production services (Townsend Decl. Exs. 23-25). Yet, while those accommodations exist for individuals inside their

production ecosystem, they are not extended to members of the public who become the subject of news coverage. These activities fall squarely within the "goods, services, facilities, privileges, advantages, or accommodations" regulated under Title III. See 42 U.S.C. § 12182(a). Just as a restaurant's website must be accessible when it enables customers to order food or visit physical stores, a media company's news-gathering, production, and broadcast operations — which originate in and depend upon physical spaces — must comply with the ADA when they serve as the primary means by which the public interacts with and is portrayed through those services.

Defendants' attempt to draw an artificial distinction between their online operations and their physical production infrastructure is inconsistent with established Ninth Circuit precedent. Because their websites, broadcasts, and digital platforms are the direct product of — and are functionally and commercially linked to — productions conducted in physical places of public accommodation, they fall squarely within Title III's scope and must be accessible to individuals with disabilities. That obligation includes providing effective communication channels through those platforms, both for individuals seeking accommodations in connection with participation in news productions and for those who, after publication, need to request reasonable modifications, such as submitting medical documentation or correcting disability-related information reported about them. Defendants cannot exploit unpaid disabled individuals during the news-gathering process in physical locations and then attempt to evade their ADA obligations by claiming that the final product of that exploitation — whether an article, a television segment, or a press release — falls outside the statute's reach.

### C. Proof of Intentional Discrimination Is Not Required — Yet the Discrimination Against Plaintiff Is Undeniable

The Ninth Circuit has made clear that no showing of intentional discrimination is required when an Unruh Civil Rights Act claim is premised on a violation of the ADA. *Lentini v. Cal. Ctr. for the Arts*, 370 F.3d 837, 847 (9th Cir. 2009) (holding that "a violation of the ADA is, by statutory definition, a violation of the Unruh Act"). Likewise,

courts have consistently held that a plaintiff need not prove intentional discrimination to establish a violation of the ADA itself. *See Martin v. PGA Tour, Inc.*, 994 F. Supp. 1242, 1247-48 (D. Or. 1998).

Congress enacted the ADA to "provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(2). As the Supreme Court has recognized, discrimination against people with disabilities often results not from overt animus but from "thoughtlessness and indifference." *Alexander v. Choate*, 469 U.S. 287, 295 (1985). Title II of the ADA ensures that individuals with disabilities are not "excluded from participation in or denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132. Title III, by contrast, applies to private entities that open themselves to the public. *Langer v. Kiser*, 57 F.4th 1085, 1100 (9th Cir. 2023). Its general rule — and the foundation for liability — is that "no individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. § 12182(a).

Here, Defendants' conduct exemplifies precisely the type of "thoughtlessness and indifference" that the ADA was designed to remedy. In 2009, Defendants expressly recognized Plaintiff's disability and provided reasonable accommodations by filming two Inside Edition segments at her home in a controlled, low-stress environment — a modification that allowed her to participate in the production safely and equally. Yet just months later, in 2010, Defendants abruptly withdrew those same accommodations without notice, staging an unannounced, on-location filming in a public parking lot. This sudden reversal not only disregarded Plaintiff's previously acknowledged needs but also marked a departure from Defendants' own established practices of providing reasonable modifications.

That pattern of selective compliance — and the discriminatory impact that flows from it — has continued into the present. In 2025, when Defendants were again informed of Plaintiff's disability and the ongoing harm caused by outdated and inaccurate medical

information in their broadcast, their public relations team promptly granted a reasonable accommodation by removing a press release. This action demonstrates that such accommodations were both feasible and easily implemented. Yet when Plaintiff made a substantially similar request of the production team — namely, to correct or update disability-related medical information in the broadcast itself — that request was summarily denied.

This disparate treatment, occurring both across departments and over time, reflects a systemic discriminatory practice. Plaintiff was provided access to certain services on an equal basis only when it was convenient for Defendants, but denied equal access to others, even when the requested modifications were reasonable, necessary, and entirely consistent with past accommodations. Such selective and inconsistent compliance with ADA obligations is itself a form of discrimination under Title III. It denies a disabled individual the "full and equal enjoyment" of the goods and services offered to the public — precisely the type of inequality the ADA was enacted to eliminate.

### D. Defendants Extend Pre- And Post-Production Accommodations To Disabled Performers But Refuse To Provide Them To Disabled News Subjects

Defendants' own public statements and corporate policies underscore the discriminatory nature of their conduct. While they openly promote accessibility initiatives and provide extensive pre- and post-production accommodations for disabled performers in their scripted programming, they categorically refuse to extend those same modifications to disabled individuals featured as news subjects. This disparity — between the accommodations they tout and those they deny — is central to Plaintiff's ADA claim and is directly evidenced by Defendants' own publicly available materials.

Plaintiff therefore requests that the Court take judicial notice of websites maintained by the Defendants. *See Barnes v. Marriott Hotel Servs., Inc.* No. 15-cv-01409-HRL, 2017 U.S. Dist. LEXIS 22588, 2017 WL 635474, at *4 (N.D. Cal. Feb. 16, 2017) taking judicial notice of a party's website because the party did not dispute the information on it. Courts have recognized that judicial notice may extend to information

made publicly available on a party's website, so long as the website's authenticity is undisputed and "it is capable of accurate and ready determination." *Doron Precision Sys., Inc. v FAAC, Inc.*, 423 F Supp 2d 173, 179 (S.D.N.Y. 2006). See also *Turner v. Samsung Telecoms. Am., LLC*, No. CV 13-00629-MWF (VBKx), 2013 WL 12126749, at *2 (C.D. Cal. 2013) (taking judicial notice of a party's website in part because the party did not dispute its authenticity).

Plaintiff respectfully requests that the Court take judicial notice of the existence and contents of materials published by Defendants on their official websites, including—but not limited to—Paramount Global's publicly available Production Policy and its Inclusion and Accessibility Initiatives webpages. These materials, maintained on Defendants' own domains, reflect Defendants' stated policies regarding disability accommodations, hiring practices, and accessibility measures for performers, crew, and other participants in their productions. (Townsend Decl. Exs. 23–25).

Specifically, these materials include:

- A press release titled "CBS Announces Expansion of Performers With Disabilities Talent Initiative With Paramount Global's Annual Summit on Disability" (available at: https://www.paramountpressexpress.com/cbs-entertainment/releases/?view=108696-cbs-announces-expansion-of-performers-with-disabilities-talent-initiative-with-paramount-globals-annual-summit-on-disability) (Ex. 23);
- The Paramount Global/CBS Performers With Disabilities Talent Initiative Voluntary Submission Form (available at: https://pwdtalentinitiative.paramount.com) (Ex. 24); and
- The Paramount Production Privacy Policy (available at: https://privacy.paramount.com/en/production-policy) (Ex. 25).

Paramount Global, CBS, and Inside Edition regularly provide post-production services as part of their content creation process. These services include the ability to modify, update, or remove sensitive information after filming, reflected in their own

publicly posted Production Privacy Policy, which describes the potential for post-production adjustments in cases involving medical, personal, or sensitive data. Such modifications are routinely available to on-air participants, including performers and other individuals whose personal circumstances warrant updates. Paramount or its subsidiaries to provide the same accommodations it extends to performers after a production concludes. Paramount's own Production Privacy Policy explicitly states that individuals featured in its productions retain ongoing rights, including:

- the right to confirm whether and how their personal information is being processed;
- the right to request access to, and a copy of, the information held about them;
- the right to object to or restrict processing;
- the right to request erasure or deletion;
- the right to correct, amend, or update information;
- the right to request portability of their personal data; and
- the right to withdraw consent to continued processing.

Despite invoking these rights in the wake of the 2025 republications — including requests to correct, update, or remove outdated medical information and to provide reasonable modifications to the presentation of the segment — Plaintiff was categorically denied every one of these accommodations. Paramount's refusal demonstrates an ongoing policy of disability-based discrimination in its post-production and syndication practices, even as it recognizes and implements identical accommodations for performers and other individuals involved in its scripted productions.

Plaintiff, a federally documented individual with a disability, requested a comparable modification: specifically, an update or correction to the February 2010 Inside Edition segment to reflect substantiated medical information provided by her treating physician. That request was a textbook example of a "reasonable accommodation" under 42 U.S.C. § 12182(b)(2)(A)(ii), especially when Defendants already offer the exact same accommodations do disabled performers.

The Supreme Court and Ninth Circuit have long recognized that "an accommodation is not reasonable if it imposes 'undue financial and administrative burdens.'" *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 288 n.17 (1987); see also *Chalk v. United States Dist. Court, Cent. Dist. of Cal.*, 840 F.2d 701, 705 (9th Cir. 1988); *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1083 (9th Cir. 2004). Here, Plaintiff's requested accommodation would impose no such burden. The modification sought — updating or correcting disability-related medical information disseminated in the broadcast — had previously been implemented in similar circumstances for other disabled individuals, was narrowly tailored and medically necessary, and was directly aimed at preventing the continued dissemination of inaccurate and outdated medical information.

## IV. CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that this Court deny Defendants' motion in its entirety. However, to the extent the Court determines that any portion of Plaintiff's complaint is insufficiently pled, Plaintiff further requests leave to amend to cure any such deficiencies.

Dated: October 6, 2025

By: ______________________

DESIREE GUERRIERE TOWNSEND
Plaintiff

**CERTIFICATE OF COMPLIANCE WITH L.R. 11-6.2**

Plaintiff certifies that this brief contains 4,546 words (excluding the caption, tables, signature block, and this certification) in compliance with the word limit of L.R. 11-6.1.

Dated: October 6, 2025

By:______________________

DESIREE GUERRIERE TOWNSEND
Plaintiff